1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5

6   JEFFREY CHEN,

7                   Plaintiff,

8          v.                                        C11-2119 TSZ

9   CITY OF MEDINA, et al.,                          ORDER

10                  Defendants.

11

12          THIS MATTER came before the Court on defendant Donna Hanson's motion for

summary judgment, docket no. 157, and defendant City of Medina's motion for summary

13   judgment, docket no. 166.  Having previously granted in part and denied in part both

14   motions, Minute Order (docket no. 234); Minute Order (docket no. 210), this Order

15   provides the Court's analysis concerning plaintiff's hostile work environment, breach of

16   employment policy, procedural due process, and First Amendment ("whistleblower")

17   claims.

18   **<u>Background</u>**

19          In November 2008, defendant Donna Hanson became city manager for defendant

20   City of Medina ("Medina").  Chen Decl. at ¶ 23 (docket no. 191).  At the time, plaintiff

21   Jeffrey Chen was Medina's chief of police.  <u>*See id.*</u> at ¶ 2 (plaintiff was appointed chief of

22

23

police in February 2004).  In January 2009, approximately two months after beginning her tenure as city manager, Hanson went on vacation and appointed Robert Grumbach, a planning director with six months of experience at Medina, to be acting city manager.  _Id._ at ¶ 30.  According to plaintiff, the previous protocol had been to appoint the chief of police to serve as acting city manager in the city manager's absence.  _Id._

In March 2009, in response to plaintiff's inquiries concerning a grant from the Department of Homeland Security, Hanson allegedly said to plaintiff, "Stop badgering me on this issue, I can't decide right at this moment, besides, I thought you Chinese people were supposed to be more patient than this!"  _Id._ at ¶¶ 32-33.  In November 2009, during a staff meeting attended by Grumbach, Medina City Clerk Rachel Baker, plaintiff, and two other department heads, Hanson allegedly asked, "Do you people celebrate Thanksgiving?" and "Do you people eat turkey?"  _Id._ at ¶ 36.  Whether her inquiry was directed to everyone present or only to plaintiff is unclear.

On September 7, 2010, plaintiff met with Medina council member Janie Lee and disclosed to her the content of an e-mail exchange between Grumbach and Hanson.  _Id._ at ¶¶ 67-68.  In the e-mails at issue, Grumbach asked Hanson, "In preparing the budget dissect worksheet, Development Services budget included step increases for both myself and Steve.  Should I continue to include those step increases?"  Ex. JJJ to Holt Decl. (docket no. 158-7 at 90); Ex. 32 to Chen Decl. (docket no. 191-32 at 2).  Hanson replied simply, "yes."  _Id._  Plaintiff accessed these messages through Medina's e-mail archive system "MX Logic."  Chen Decl. at ¶ 66.

1    The parties disagree about the relevance of the correspondence between Grumbach

2 and Hanson.  Plaintiff asserts that the e-mails evidence Hanson's disregard of the Medina

3 City Council's decision to impose a "salary freeze."  *See* Lee Dep. at 44:2-13, Ex. 47 to

4 Chen Decl. (docket no. 191-47) (indicating that the council was "unanimous" on the

5 salary issue at a public meeting sometime before plaintiff and council member Lee spoke

6 in September 2010).  Defendants counter that the council's directive "to hold salaries

7 steady" was not issued until October 11, 2010, almost two and a half months after the

8 exchange of e-mails between Grumbach and Hanson.  *See* Ex. KKK to Holt Decl. (docket

9 no. 158-7).

10    On October 19, 2010, Don Eagon, an information technology consultant, told

11 Medina City Clerk Baker that Craig Fischer, a Medina employee, had been reading the

12 city manager's and mayor's e-mails.  *See* Baker Dep. at 53:2-15, Ex. V to Holt Decl.

13 (docket no. 158-3); Baker's Notes, Ex. W to Holt Decl. (docket no. 158-3 at 21).  The

14 following day, October 20, 2010, Hanson learned from Baker that MX Logic had been

15 accessed frequently between September 1 and October 20, 2010, via the login identity

16 "rachel_prr," which Baker no longer used.  Baker's Notes (docket no. 158-3 at 22); Baker

17 Dep. at 53:25-54:16 (docket no. 158-3).  Baker advised Hanson that she had previously

18 given the username "rachel_prr" and associated password to plaintiff.[1]  Baker Dep. at

19 54:17-55:9 (docket no. 158-3).

20

21 ───────────────────

22 [1] In her deposition, Baker testified that plaintiff approached her one evening, after business hours, and
asked for access to Medina's e-mail archive.  Baker Dep. at 39:23-25 (docket no. 158-3).  Baker told
plaintiff that she wasn't comfortable giving him such access, but plaintiff told her that "it was important,"

23

ORDER - 3

1    Sometime over the next few days, Eagon reported Fischer's conduct to Medina

2    Police Sergeant John Kane and Medina Police Officer Emmet Knott.  Ex. 1 to Lenhart

3    Report, Ex. D to Jones Decl. (docket no. 169-4 at 30-31).  On October 26, 2010, while

4    Baker was present, plaintiff told Hanson about the information Eagon had shared with

5    Sergeant Kane and Officer Knott.  Chen Decl. at ¶ 70 (docket no. 191); Baker's Notes

6    (docket no. 158-3 at 28).  Two days later, on October 28, 2010, plaintiff forwarded to

7    Hanson memoranda written by Sergeant Kane and Officer Knot describing their

8    respective conversations with Eagon.  Exs. Y, Z, & AA to Holt Decl. (docket no. 158-3).

9    On December 15, 2010, during the course of an investigation concerning who had

10    been accessing Medina's e-mail archive system, plaintiff was interviewed by Michael

11    Bolasina, an attorney assigned to provide "pre-defense" services to Medina.  _See_ Bolasina

12    Dep. at 46:14-22, 47:1-15, 48:6-22, 62:2-10 Ex. CC to Holt Decl. (docket no. 158-3).

13    Baker was also present.  The parties dispute exactly how statements made by plaintiff in

14    this interview should be interpreted.  Both Bolasina and Baker recollect that plaintiff

15    denied receiving an MX Logic username and password from Baker and indicated that "he

16    had not had a login or password for any purpose." _Id._ at 92:21-22, 97:6-10, 97:12-98:4;

17    Baker's Notes (docket no. 158-3 at 45); Bolasina Decl. at ¶ 7, Ex. FF to Holt Decl.

18    (docket no. 158-4).  Plaintiff indicates that he misunderstood the nature of Bolasina's

19    inquiry, believing the only individual under investigation was Fischer, and that he did not

20

21    _____

22    "he should have access," and "he needed it immediately."  _Id._ at 39:25-40:3.  Baker indicated that she felt
     intimidated and as though she didn't have any choice.  _Id._ at 39:19-23, 40:7-16.

23

ORDER - 4

perceive Bolasina to be asking about his own access to MX Logic.  Chen Decl. at ¶¶ 80-82 (docket no. 191).

Two days later, on December 17, 2010, plaintiff met with defendant Hanson.  The parties provide vastly different accounts of what transpired in that meeting.  Plaintiff asserts that defendant Hanson gave him an ultimatum, stating that he could either resign or be placed on administrative leave.  _Id._ at ¶ 92.  According to plaintiff, he reacted emotionally, took a blank sheet of paper from defendant Hanson's printer, and wrote a letter of resignation.  _Id._ at ¶ 93; _see_ Ex. HH to Holt Decl. (docket no. 158-4 at 17).  In contrast, Hanson indicates that plaintiff arrived in her office with two large envelopes; from one of the envelopes, plaintiff pulled out his letter of resignation and handed it to Hanson.  Lenhart Report at 7 (docket no. 169-4).  The remaining contents of the two envelopes included plaintiff's badges and department identification cards, four sets of keys and an electronic key card, a Motorola cell phone, and an iPod touch.  _Id._; _see_ Hanson Memo. at 2, Ex. 6 to Lenhart Report (docket no. 169-4 at 55); _see also_ Inventory, Ex. L to Jones Decl. (docket no. 169-12).  Hanson has expressed her surprise or "shock" at receiving plaintiff's resignation, and has denied asking for or demanding it.  _See_ Hanson Memo. at 2 (docket no. 169-4 at 55).

Six days later, on December 23, 2010, plaintiff sent Hanson a letter indicating that he was rescinding his resignation.  Ex. LL to Holt Decl. (docket no. 158-4 at 26).  On December 27, 2010, plaintiff appeared at the Medina Police Department and interacted with Lieutenant Dan Yourkoski, then acting chief of police.  Yourkoski Memo., Ex. UU to Holt Decl. (docket no. 158-4 at 69-70).  According to Yourkoski, plaintiff seemed

1  agitated, announced he was not resigning, and demanded his keys, credentials, firearm,

2  and cell phone. *Id.* at 1.  The last item was still with Hanson.  *Id.*  Yourkoski later over-

3  heard plaintiff on the phone asking to meet with Hanson, after which plaintiff left the

4  station.  *Id.* at 2.

5      Plaintiff went to Hanson's office.  Hanson then told him that she needed to consult

6  with the city attorney and she asked him to leave.  Lenhart Report at 5 (docket no. 169-4).

7  Hanson later sent plaintiff an e-mail placing him on administrative leave with pay

8  "pending the outcome of an ongoing investigation of which you are already aware."

9  Ex. VV to Holt Decl. (docket no. 158-4 at 72-73).  An exchange of correspondence

10  between plaintiff and Hanson ensued, with copies of each memorandum also directed to

11  members of the Medina City Council.  *See* Exs. 4, 6, & 7 to Lenhart Report (docket

12  no. 169-4).

13      On February 2 and 10, 2011, the Medina City Council held special meetings,

14  recessing into executive sessions, to discuss the situation.  Exs. XX & YY to Holt Decl.

15  (docket no. 158-5).  Shortly thereafter, Ellen K. Lenhart, an outside attorney, began

16  conducting an investigation.  On February 22, 2011, after completing her interviews,

17  Lenhart provided an oral report to Stephanie Alexander, defendants' counsel; she sent a

18  written report to Alexander on March 23, 2011.  *See* Lenhart Report (docket no. 169-4);

19  *see also* Ex. AAA to Holt Decl. (docket no. 158-5).

20      On March 31, 2011, Hanson sent plaintiff a "*Loudermill*/Pre-Disciplinary Notice."

21  Ex. CCC to Holt Decl. (docket no. 158-6); Ex. E to Jones Decl. (docket no. 169-5).  The

22  notice identified six allegations for which Hanson indicated that she was contemplating

23

ORDER - 6

discipline "up to and including termination." *Id.*  A copy of Lenhart's report was attached to this notice.

On April 14, 2011, Hanson conducted a pre-termination hearing.  Chen Decl. at ¶ 141 (docket no. 191).  According to plaintiff, he hired a court reporter for the hearing, but Alexander and Kari Sand, a representative of the city attorney, refused to allow the court reporter to transcribe the hearing.  *Id.* at ¶ 143.  Plaintiff was accompanied to the hearing by two attorneys, but he alleges he was "threatened" with forfeiture of the hearing unless he elected between them.  *Id.* at ¶ 145.  At the hearing, plaintiff distributed a three-page written objection, in which he demanded that Hanson "withdraw as the decisionmaker," accused Lenhart of being biased because she is friends with Eric Hokanson,[2] and challenged the "entire process" as "a witch hunt."  *Id.* at ¶ 146; *see* Ex. 50 to Chen Decl. (docket no. 191-50); Ex. FFF to Holt Decl. (docket no. 158-7).  Plaintiff asserts that he was told to proceed with Hanson presiding or forfeit the right to a pre-termination hearing.[3]  Chen Decl. at ¶ 146 (docket no. 191).  Plaintiff then read from

---

[2] Hanson subsequently rejected the contention that Lenhart was biased, explaining that Eric Hokanson is an employee at a shop where Lenhart took her car for servicing.  Ex. GGG to Holt Decl. (docket no. 158-7 at 58).  Hanson's understanding was that Hokanson facilitated the servicing of Lenhart's vehicle a few times many years ago; Lenhart had not seen Hokanson for more than ten years, and until she saw his name in plaintiff's counsel's letter, she did not know his last name.  *Id.*  This view is consistent with plaintiff's evidence, which consists of the declaration of his former attorney, Julie Kebler, who indicated that Lenhart said she recalled Hokanson "fondly," explaining that Lenhart had dropped off her car for service in the past and Hokanson would drive her to work and pick her up to return to the station.  Kebler Decl. at ¶ 4, Ex. 56 to Chen Decl. (docket no. 191-56).

[3] Plaintiff had alleged that Hanson had a conflict of interest because (i) plaintiff had disclosed Hanson's alleged "violation of the specific fiscal direction of the council to conform with budget constraints and to not issue raises," (ii) Hanson was the only other witness to plaintiff's resignation, and (iii) Hanson had "proven her racial bias" through her "do you people eat turkey" inquiry.  *See* Ex. FFF to Holt Decl. (docket no. 158-7 at 52-53).

a 15-page written response to the hearing notice and a 33-page written response to Lenhart's report.  Chen Decl. at ¶¶ 143, 147, & 148 (docket no. 191); <u>see</u> Exs. DDD & EEE to Holt Decl. (docket no. 158-7).

On April 27, 2011, Hanson sent plaintiff a "Notification of Termination," identifying six reasons for the discharge.  Ex. GGG to Holt Decl. (docket no. 158-7); Ex. F to Jones Decl. (docket no. 169-6).  In this Notification, Hanson observed that plaintiff had not raised "any issues of 'racial bias' during either [Bolasina's or Lenhart's] investigation or to [her] prior to [his] statements in the Loudermill hearing," and that raising such issue for the first time at the pre-termination hearing did not "negate" plaintiff's conduct.  <u>Id.</u> at 3.  Hanson concluded that she had "no choice but to terminate [plaintiff's] employment," effective at the end of the day on April 27, 2011.  <u>Id.</u>  On June 13, 2011, plaintiff appeared before the Medina City Council, at a public meeting, and explained why he did not believe he should have been terminated.  Response to Request for Admission No. 18, Ex. BBB to Holt Decl. (docket no. 158-6 at 7).  The Medina City Council did not overturn Hanson's decision.  This litigation commenced on December 16, 2011.

Plaintiff has asserted several claims, and defendants have moved for summary judgment on all of them.  The Court has already granted partial summary judgment in favor of defendants and dismissed with prejudice all of plaintiff's conspiracy claims, plaintiff's claim under 42 U.S.C. § 2000e-3, and all of plaintiff's claims against defendant Bret Jordan.  Order (docket no. 209); Minute Order (docket no. 210).  The Court has also previously denied defendants' motions for summary judgment with

respect to plaintiff's substantive due process claim, as well as his disparate treatment

claims under 42 U.S.C. §§ 1981, 1983, & 2000e-2 and Washington's Law Against

Discrimination, RCW 49.60.030 & .180, concluding that genuine issues of material fact

exist.  Minute Order (docket no. 210); Minute Order (docket no. 234).  This Order sets

forth the Court's reasoning for granting summary judgment in favor of defendants as to

plaintiff's other remaining claims, namely for (i) hostile work environment, (ii) wrongful

termination in breach of employment policy, (iii) violation of procedural due process,

(iv) retaliation in violation of the First Amendment, (v) retaliatory discharge in violation

of RCW 49.60.210(2), and (vi) discharge in violation of public policy.

**Discussion**

**A.     Defendants' Motion to Strike**

        In response to defendants' motion for summary judgment, plaintiff proffered the

declarations of Shawn Whitney, docket no. 187, Wilson Edward Reed, Ph.D., docket

no. 189, and Heija Nunn, docket no. 190.  Defendants have moved to strike these

declarations.  *See* Reply (docket no. 194).  Defendants' motion to strike is GRANTED in

part and DENIED in part.  The Court has considered each of these declarations only to

the extent that they contain relevant facts of which the declarant has personal knowledge

and that would be admissible in evidence, Fed. R. Civ. P. 56(c)(4), or offer appropriate

expert testimony, *see* Fed. R. Evid. 702, 703, & 704.

/ / /

/ / /

/ / /

ORDER - 9

1   **B.**     <u>**Standard for Summary Judgment**</u>

2        The Court shall grant summary judgment if no genuine issue of material fact exists

3   and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To

4   survive a motion for summary judgment, the adverse party must present "affirmative

5   evidence," which "is to be believed" and from which all "justifiable inferences" are to be

6   favorably drawn.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 257 (1986).

7   Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and

8   upon motion, against a party who fails to make a showing sufficient to establish the

9   existence of an element essential to that party's case, and on which that party will bear

10  the burden of proof at trial."  <u>Beard v. Banks</u>, 548 U.S. 521, 529 (2006) (quoting <u>Celotex</u>

11  <u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

12  **C.**     <u>**Hostile Work Environment**</u>

13       In asserting a cause of action for hostile work environment, plaintiff has invoked

14  the "unitary, indivisible claim" theory outlined in <u>Nat'l R.R. Passenger Corp. v. Morgan</u>,

15  536 U.S. 101 (2002), and <u>Antonius v. King County</u>, 153 Wn.2d 256, 103 P.3d 729 (2004).

16  Under the "unitary, indivisible claim" theory, which supplanted the previous "continuing

17  violation" doctrine, all acts contributing to the alleged hostile work environment are

18  treated as one unlawful employment practice, and a plaintiff's claim is considered timely

19  filed as long as one of the acts at issue occurred during the limitations period.[4]  <u>Morgan</u>,

20

21  _____

22  [4] The limitations period under Title VII is 300 days, under § 1981 is four (4) years, and under the
    Washington Law Against Discrimination is three (3) years.  42 U.S.C. § 2000e-5(e)(1); 28 U.S.C. § 1658;
    RCW 4.16.080(2); <u>see</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369 (2004); <u>Antonius</u>, 153 Wn.2d at

23

1    536 U.S. at 117-18; _Antonius_, 153 Wn.2d at 264-66.  To constitute one actionable

2    unlawful employment practice, however, the various acts "must have some relationship

3    to each other." _Antonius_, 153 Wn.2d at 271; _see Morgan_, 536 U.S. at 118.  Intervention

4    by an employer can destroy the connection between earlier and later acts.  _Id._

5         In this case, to support his hostile work environment claim, plaintiff relies on

6    racist remarks attributed to his previous or current subordinates, a former council

7    member, the prior chief of police, the mayor, and the current city manager.  _See_ Response

8    at 9 (docket no. 186).[5]  The issue for the Court is which, if any, of these offensive

9    statements can be considered.  When the acts contributing to the alleged hostile work

10   environment are committed by a non-supervisory employee, such acts are imputed to the

11   employer only if the plaintiff demonstrates that the employer (i) authorized, knew, or

12   should have known of the harassment, and (ii) failed to take reasonably prompt and

13   adequate corrective action.  _Swenson v. Potter_, 271 F.3d 1184, 1191-92 (9th Cir. 2001);

14   _Washington v. Boeing Co._, 105 Wn. App. 1, 11, 19 P.3d 1041 (2000).[6]  This standard

15

---

16   261-62.  For plaintiff's state law claim, the limitations period is tolled during the sixty-day period of
      mandatory presentment to a governmental entity.  RCW 4.96.020(4).  Plaintiff filed a charge with the
17   Washington State Human Rights Commission on July 18, 2011.  _See_ Ex. III to Holt Decl. (docket
      no. 158-7).  Plaintiff commenced this lawsuit on December 16, 2011.  Thus, the relevant dates for
18   assessing whether acts fall within the limitations period are as follows:  (i) for plaintiff's Title VII claim,
      September, 21, 2010; (ii) for plaintiff's § 1981 claim, December 16, 2007; and (iii) for plaintiff's state
19   law claim, October 17, 2008.

20   [5] In his response to Medina's motion for summary judgment, plaintiff also refers to comments by former
      council member Jim Lawrence.  Plaintiff, however, fails to describe or offer evidence of any remarks
      Lawrence might have made.

21   [6] On the other hand, when a supervisor engaged in the acts contributing to the alleged hostile work
      environment, the employer ordinarily will be vicariously liable.  _Nichols v. Azteca Restaurant Enters._,
22   _Inc._, 256 F.3d 864, 877 (9th Cir. 2001); _Sangster v. Albertson's, Inc._, 99 Wn. App. 156, 164, 991 P.2d
      674 (2000).  In such situation, if no "tangible employment action" was taken against the plaintiff, the

23

ORDER - 11

applies with respect to three of the six individuals plaintiff alleges made bigoted comments, namely former Lieutenant Roger Skinner,[7] former council member Lucius Biglow,[8] and Lieutenant Yourkoski.

---

employer may raise an affirmative defense requiring proof of two elements:  (i) the employer exercised reasonable care to prevent and promptly correct the improper behavior; and (ii) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.  *Nichols*, 256 F.3d at 877 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)); *see Sangster*, 99 Wn. App. at 165 (also citing *Faragher* and *Ellerth*).  Defendants have withdrawn and the Court has stricken the *Faragher/Ellerth* defense in this matter.  *See* Response at 8-9 (docket no. 182); *see also* Minute Order at ¶ 5(a) (docket no. 210).

[7] Lieutenant Skinner was placed on administrative leave after two employees, Briana Beckley and Linda Crum, reported to then Corporal Daniel Yourkoski, who was serving as acting chief of police while plaintiff was out of town, that Skinner had made inappropriate comments to them.  *Skinner v. City of Medina*, 2011 WL 1364538 at *1 (Wash. Ct. App. Apr. 11, 2011); Chen Decl. at ¶¶ 6-7, Ex. 6 to Chen Decl. (docket no. 191-6).  Yourkoski informed then City Manager Doug Schulze, who initiated an investigation.  *Skinner*, 2011 WL 1364538 at *1.  Beckley and Crum reported that Skinner told them plaintiff referred to them as "monkeys at a keyboard" and said "any monkey could do [their] job."  *Id.*  Beckley also indicated that Skinner said, "One thing I've noticed is that even though there are a lot of Asian people in Seattle, there aren't a lot of Asians as supervisors at Seattle.  I think Asians don't make good managers because people don't like them."  *Id.*  Plaintiff denied making the statements about "monkeys" that Skinner attributed to him.  Chen Decl. at ¶ 7 (docket no. 191-6).  Skinner was ultimately terminated.  He appealed to the Medina Civil Service Commission, which upheld Skinner's termination, but the King County Superior Court remanded for new proceedings, concluding that the record was inadequate for review; the Washington Court of Appeals affirmed and the Washington Supreme Court recently denied review.  *Skinner v. Civil Serv. Comm'n*, 2011 WL 5555850 (Wash. Ct. App. Nov. 14, 2011), *review denied*, 173 Wn.2d 1031, 274 P.3d 374 (2012).

[8] Former council member Lucius Biglow was censured by the Medina City Council for sending two disturbing e-mails.  *See* http://seattletimes.com/html/localnews/2008281293_medina18m.html (Peyton Whitely, "Medina censures councilman" (Oct. 18, 2008)) [hereinafter "Whitely, *Seattle Times*"]; http://www.bellevuereporter.com/news/31169569.html. (Joshua Adam Hicks, "Medina City Council censures member Biglow" (Oct. 20, 2008)) [hereinafter "Hicks, *Bellevue Reporter*"].  In one e-mail, Biglow referred to himself "in joking fashion as a past nominee for president of the 'United Predators of Medina,' noting that he had considered naming the gas-station employee [Hokanson] as executive director of the imaginary organization."  *See* Hicks, *Bellevue Reporter*; *see also* Ex. 25 to Chen Decl. (docket no. 191-25).  In the other e-mail, Biglow presented "a lengthy parody written in the style of author [J.K.] Rowling's Harry Potter books, filled with references to 'muggles' and 'dark wizards.'"  *See* Whitely, *Seattle Times*; *see also* Ex. 58 to Chen Decl. (docket no. 191-58).  Biglow's faux report by "Rita Skeeter," a character in one of Rowling's novels, describes the present owner of "the Store" as "a divorced woman who reportedly ran a cheap motel near Tacoma which was closed for sanitary violations.  She then bought the Medina grocery, disregarded the counsel of the former proprietor (much loved and once mayor of the town), was unable to succeed and closed it . . . ."  Ex. 58 to Chen Decl.  The faux report further indicates that developers want to convert the Store into a real estate office and they,

ORDER - 12

With regard to the first individual, plaintiff cannot establish that Skinner's remarks are related to acts occurring within the limitations period.  Among plaintiff's claims, the one with the longest limitations period is the claim brought pursuant to § 1981.  Skinner's statements, however, were made long before the applicable date under § 1981, namely December 16, 2007.  Indeed, Skinner was placed on administrative leave in February 2006, and his comments would have preceded such adverse employment action.  Thus, to rely on Skinner's remarks for his hostile work environment claim, plaintiff must show a relationship between them and at least one act occurring within the limitations period.  Plaintiff cannot do so, however, because Medina took intervening actions, namely placing Skinner on administrative leave and discharging him, thereby destroying any link between Skinner's conduct and whatever behavior occurred within the limitations period.  *See* *Morgan*, 536 U.S. at 118; *Antonius*, 153 Wn.2d at 271.

The same analysis applies to the offensive e-mails by former council member Biglow, at least with respect to plaintiff's Title VII and state law claims.  As to those claims, Biglow's actions fall outside the limitations period, and plaintiff cannot connect them to conduct within the limitations period because Medina engaged in corrective measures, namely publicly censuring Biglow.  With regard to plaintiff's § 1981 claim, Biglow's allegedly racist statements cannot be imputed to Medina because Biglow was

---

"pretending to support the Owner and cleverly suggesting that she is the victim of racial (she is Korean) discrimination and the innocent victim of an aggressive and bullying City government, infiltrated the City Council and the Staff, promising her all that she might want if she would be patient and persistent."  *Id.*  The e-mail ends with an observation that "lawyers for the Owner and the City are fomenting discord and expecting fat fees, Lawyers are skillfully utilized by the Dark Lord, and must be watched."  *Id.*

ORDER - 13

not plaintiff's supervisor, and under the standards applicable to non-supervisory

scenarios, Medina is not liable for Biglow's remarks because it took prompt disciplinary

action against Biglow.  *See* *Swenson*, 271 F.3d at 1191-92.

As to Yourkoski, any acts alleged to have created a hostile work environment

cannot be imputed to Medina.  Yourkoski was never plaintiff's supervisor, or even his

peer.  Yourkoski was plaintiff's subordinate.  To the extent Yourkoski's behavior was

inappropriate, plaintiff had the authority and the responsibility to take corrective action.

Indeed, plaintiff indicates that he did so with respect to each act by Yourkoski.[9]  Plaintiff

makes no allegation that he advised defendant Hanson, members of the Medina City

Council, or any other Medina official about any racist remarks made by Yourkoski, and

he offers no basis on which Medina can be held vicariously liable for any such conduct.

With respect to statements by former Chief of Police Michael Knapp,[10] the

analysis is somewhat different.  All of the offensive remarks attributed to him were made

outside the limitations period, and thus, to rely on former Chief Knapp's comments for

---

[9] Plaintiff alleges that, prior to his resignation and Yourkoski's elevation to acting chief of police, Yourkoski engaged in "vicious hostile parody," repeating former Chief of Police Michael Knapp's comments, "You can't trust a smiling Chinaman" and "Chen's a regular Charlie Chan."  Chen Decl. at ¶ 40 (docket no. 191).  Plaintiff admonished Yourkoski, directing him not to make such statements "ever again."  *Id.*  Plaintiff also indicates that, during a staff meeting in which goals for the year were being discussed, Yourkoski wrote "NEW CHIE" [sic] on the white board behind plaintiff's back.  *Id.* at ¶ 41. This action elicited laughter from attendees.  *Id.*  Plaintiff issued a written reprimand for insubordination and placed it in Yourkoski's personnel file.  *Id.*

[10] While chief of police, Knapp allegedly made the following comments:  (i) after observing plaintiff walking by and smiling about something, "You can never trust a smiling Chinaman," (ii) after watching plaintiff jump up and kick a spider hanging from the ceiling, "That captain, he's a regular Charlie Chan," probably meaning Jackie Chan, (iii) after interviewing a black male candidate who had wrestled heavyweight in college, "I bet those hands would be great for picking cotton," and (iv) in reference to someone's son, indicating that the individual had "midgetitis," in response to which another officer corrected him, saying such word would actually mean "an inflamed midget."  Yourkoski Dep. at 52:13-19, 55:17-56:4, 56:10-25, 57:4-15, Ex. A to Jones Decl. (docket no. 176-1).

ORDER - 14

purposes of a hostile work environment claim, plaintiff must show a link between former

Chief Knapp's behavior and at least one act occurring within the limitations period.

Plaintiff has failed to do so.  Plaintiff makes no connection between Chief Knapp's

remarks and those of either Hanson or former Mayor Jordan, whose statements are the

only relevant ones alleged to have been made during the limitations period.

Hanson was not city manager when Knapp was chief of police.  Knapp retired

almost five years before Hanson became city manager, and during the interval between

the end of Knapp's tenure as chief of police and Hanson's selection as city manager,

Medina had two other city managers and an interim city manager.  Plaintiff cites to no

evidence that Hanson even knows Knapp, let alone was influenced by him, such that the

comments attributed to her might be viewed as part of a continuing practice of creating a

hostile work environment.  The same can be said with respect to Jordan.  Jordan did not

become mayor until approximately six years after Knapp retired.  Unlike the city

manager, the mayor has no supervisory authority over the chief of police, and plaintiff

cannot make any connection between Jordan's remarks and those of former Chief Knapp.

In sum, plaintiff's reliance on statements made by anyone other than Hanson and

Jordan is misplaced.  Such remarks are not part of one actionable unlawful employment

practice, and plaintiff cannot premise his hostile work environment claim on them.

Turning now to the conduct of Hanson and Jordan,[11] the question is whether plaintiff has

_____

[11] Although Jordan has been dismissed as a defendant, his comments might still form the basis of a hostile
work environment claim for which Medina might be liable.  Plaintiff asserts that, prior to becoming

ORDER - 15

presented sufficient material to warrant a trial on his hostile work environment claim. He has not.

The standards for a prima facie case of hostile work environment are similar under federal and state law. Under both § 1981 and Title VII, a plaintiff must show that (i) he or she was subjected to verbal or physical conduct because of his or her race, (ii) the conduct was unwelcome, and (iii) the conduct was sufficiently severe or pervasive to alter the conditions of his or her employment and create an abusive work environment. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). The work environment must be perceived as abusive from both a subjective and an objective point of view. *Vasquez*, 349 F.3d at 642. In evaluating whether the conduct satisfies the prima facie threshold for being sufficiently severe or pervasive, the Court must consider "all the circumstances," including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with the employee's performance. *Johnson*, 534 F.3d at 1122.

Similarly, under the Washington Law Against Discrimination, to establish a claim for hostile work environment, a plaintiff must prove that the alleged harassment (i) was unwelcome, (ii) was because of membership in a protected class, (iii) affected the terms

---

mayor, Jordan commented to plaintiff, "I thought Asians had small ones; how did you have four kids?" Chen Decl. at ¶ 42 (docket no. 191). Plaintiff also accuses Jordan of saying, after receiving a knife as a gift from plaintiff, "I know how to use one of these. I'm a skinner not a gutter." *Id.* at ¶ 43. Finally, plaintiff indicates that Jordan disclosed to him that members of Jordan's family are racist. *Id.* at ¶ 44.

and conditions of employment, and (iv) was imputable to the employer.  *Clarke v. Office of the Attorney Gen.*, 133 Wn. App. 767, 785, 138 P.3d 144 (2006).  To satisfy the third element, the harassment must be "sufficiently pervasive so as to alter [the plaintiff's] employment conditions" and the conduct must be more than "merely offensive."  *Id.*

Here, in support of his hostile work environment claim, plaintiff has identified only two isolated comments by Hanson[12] and three statements by Jordan, one of which merely acknowledges the racist attitudes of family members.  These stray remarks are neither severe nor pervasive, as a matter of law, and plaintiff makes no showing that the statements unreasonably interfered with his ability to do his job as chief of police.  The Court has therefore GRANTED defendants' motions for summary judgment as to plaintiff's hostile work environment claim and DISMISSED such claim with prejudice.  The Court has made no ruling, however, concerning whether Hanson's and/or Jordan's comments are admissible at trial with respect to plaintiff's disparate treatment claim.

D.   **Breach of Employment Policy**

An employment contract that is indefinite as to duration is generally terminable at will by either the employee or the employer.  *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 223, 685 P.2d 1081 (1984).  A requirement that termination of an employee be justified by "cause" will be inferred if the parties had an implied agreement to that effect or if the employee gave consideration in addition to the contemplated service.  *Id.*

---

[12] One of these statements is not obviously racist or racially insensitive in nature.  In asking whether "you people eat turkey," Hanson might have been addressing four individuals in addition to or other than plaintiff, and her question could reasonably be interpreted as merely inquiring whether the folks present at the meeting served something other than turkey at Thanksgiving.

1    In addition, an at-will employment relationship can be modified by provisions in an

2    employee handbook or similar document.  _Swanson v. Liquid Air Corp._, 118 Wn.2d 512,

3    520, 826 P.2d 664 (1992).

4          "Only those statements in employment manuals that constitute promises of

5    specific treatment in specific situations are binding."  _Stewart v. Chevron Chem. Co._, 111

6    Wn.2d 609, 613, 762 P.2d 1143 (1988).  "[P]olicy statements as written may not amount

7    to promises of specific treatment and merely be general statements of company policy,

8    and thus, not binding."  _Id._ (quoting _Thompson_, 102 Wn.2d at 231).  Employers may

9    avoid being bound by statements in manuals and the like if they "specifically state in a

10   conspicuous manner that nothing contained therein is intended to be part of the

11   employment relationship and are simply general statements of company policy."

12   _Thompson_, 102 Wn.2d at 230; _see also_ _Bulman v. Safeway, Inc._, 144 Wn.2d 335, 344-45,

13   27 P.3d 1172 (2001) (approving jury instruction requiring plaintiff to prove that (i) the

14   statements in the policy manual amounted to promises of specific treatment in specific

15   situations; (ii) the plaintiff justifiably relied upon any such promise; and (iii) the promise

16   of specific treatment was breached); _Daignault v. Pac. Nw. Reg. Council of Carpenters_,

17   2011 WL 1833833 (Wash. Ct. App. May 16, 2011) (holding that "any alleged promises

18   in the personnel policy were effectively disclaimed" and that "the personnel policy makes

19   no enforceable promises of specific treatment" as to progressive discipline).

20         Plaintiff contends that the Medina Police Department Manual of Standards makes

21   promises of specific treatment in specific situations.  Plaintiff relies on the following

22   provisions:

23

ORDER - 18

> All complaints against the agency or its employees will be investigated and properly documented. . . .  Objectivity, fairness, and justice are assured by intensive and impartial investigation and review to clear the innocent, establish guilt of wrongdoers, and facilitate fair, suitable, and consistent disciplinary action.

Standard No. 52.1.1(I) (docket no. 179-12 at 21).

> If the allegation or complaint is made against the Chief of Police, the complaint will be directed to the City Manager's Office.

Standard No. 52.1.2(II) (docket no. 179-12 at 24).

> To achieve a speedy resolution to internal affairs issues, an Internal Affairs investigation will generally be completed within 30 days [after] assigning an Internal Affairs number.  A verbal status report will be given to the Chief of Police at least weekly.  In cases where extenuating circumstances exist, the time limit may be extended by the assigned supervisor, with approval of the Chief of Police.

Standard No. 52.1.4(I) & (II) (docket no. 179-12 at 24).

> An assessment of each allegation of employee misconduct shall be made and classified as one of the following.
>
> A.    Exonerated . . . .
> B.    Sustained . . . .
> C.    Not Sustained . . . .
> D.    Unfounded . . . .
> E.    Misconduct not based on the original complaint . . . .

Standard No. 52.1.9(I) (docket no. 179-12 at 27).

> If a complaint is sustained, disciplinary action will be taken.  Depending on the severity of the violation involved and the officer's past record, such action could include but not necessarily be limited to . . . [t]ermination of [e]mployment.

Standard No. 52.1.9(III) (docket no. 179-12 at 28).

Plaintiff fails to show how any of these provisions constitutes a promise of specific treatment in a specific situation.  The first section merely identifies a policy of

ORDER - 19

1    investigating complaints, followed by a platitude about how such investigations promote

2    justice.  The second quoted passage indicates that complaints about the chief of police are

3    handled by the city manager, thereby removing such complaints from the procedures set

4    forth in the Manual of Standards.  This conclusion is supported by the next provision,

5    which requires that weekly status reports be provided to the chief of police, and that the

6    chief of police has the authority to approve an extension of the time for completing an

7    investigation.  Status reports to, and extensions granted by, the chief of police would be

8    inappropriate with respect to an investigation of the chief of police, and the Court

9    concludes that the Manual of Standards applies only to those investigations involving

10   subordinates.

11           Moreover, even if the Manual of Standards governed the investigation of plaintiff,

12   plaintiff fails to cite any provision that was violated.  Plaintiff was given written notice of

13   the allegations against him, was provided Garrity warnings in advance of his interview by

14   Ellen Lenhart, _see_ Chen Decl. at ¶ 120 (docket no. 191), and had a Loudermill hearing

15   prior to his termination, as envisioned in Standard No. 52.1.6 (docket no. 179-12 at 25-

16   26).  Although Hanson did not use the word "sustained" in her written notice of

17   termination, _see_ Ex. 1 to Chen Decl. (docket no. 191-1), the clear import of her

18   memorandum was that the allegations were "supported by proper and sufficient

19   evidence," as required by Standard No. 52.1.9(I)(B).  Finally, plaintiff cannot make any

20   contention that the Manual of Standards promises progressive discipline, and discharge

21   was clearly within the panoply of options available to Hanson.  The Court has therefore

22   GRANTED defendants' motions for summary judgment as to plaintiff's state law claim

23

1   of wrongful termination in breach of employment policy and DISMISSED such claim

2   with prejudice.

3   **E.    Procedural Due Process**

4          As an at-will employee, plaintiff was entitled only to a name-clearing hearing, not

5   to a pre-termination hearing concerning the discharge itself.  _Eklund v. City of Seattle_

6   _Mun. Court_, 628 F.3d 473, 484 n.1 (9th Cir. 2010) (citing _Bd. of Regents of State Colls. v._

7   _Roth_, 408 U.S. 564 (1972)).  Only public employees with "a constitutionally protected

8   property interest" in their employment (for example, by way of tenure or a collective

9   bargaining agreement), have a due process right to the type of pre-termination hearing

10  commonly referred to as a Loudermill hearing.  _Cleveland Bd. of Educ. v. Loudermill_,

11  470 U.S. 532 (1985); _see_ _Roth_, 408 U.S. at 578 (untenured professor "did not have a

12  property interest sufficient to require the University authorities to give him a hearing

13  when they declined to renew his contract of employment"); _Segal v. N.Y.C._, 459 F.3d 207

14  (2d Cir. 2006) (holding that availability of an adequate post-termination name-clearing

15  hearing defeated the plaintiff's due process "stigma-plus" claim); _Johnson v. City of_

16  _W. Memphis_, 113 F.3d 842 (8th Cir. 1997); _see also_ _Greenwood v. Fed. Aviation Admin._,

17  28 F.3d 971, 977 (9th Cir. 1994) ("Because we find that Greenwood had neither a

18  property nor a liberty interest in a renewed [pilot examiner designation], he was not

19  entitled to procedural due process in the renewal process.").

20         Thus, plaintiff's contentions that Hanson should not have presided over his pre-

21  termination hearing and that the pre-termination hearing was defective because he was

22

23

not permitted to have a court reporter and a second attorney present lack merit.[13]   Plaintiff

was provided more process than he was due in light of his "at will" status.  With regard to

any "stigma-plus" claim, plaintiff has made no allegation that the post-termination name-

clearing hearing he received before the Medina City Council was in any way insufficient

or procedurally defective.[14]   The Court has therefore GRANTED defendants' motions for

_____

[13] Plaintiff offers no authority for the proposition that he was entitled to have a court reporter and a second attorney present at the pre-termination hearing, and plaintiff's assertion that Hanson was precluded from presiding over the pre-termination hearing lacks merit.  A government employee facing discharge is not entitled to an unbiased *Loudermill* decision-maker, as long as the decision-maker at the post-termination hearing is impartial.  *Vanderwalker v. King County*, 91 Fed. Appx. 545, 546 (9th Cir. 2004) (citing *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991)).  Thus, even if plaintiff had a right to a *Loudermill* hearing, and even if Hanson was biased, because plaintiff makes no contention that the post-termination decision-maker, *i.e.*, the Medina City Council, was not impartial, plaintiff has no cognizable claim.

[14] Plaintiff does not appear to contend that a name-clearing hearing must occur before termination.  To the extent, however, that plaintiff makes such argument, the Court concludes that it lacks merit.  A "stigma-plus" claim requires proof that (i) the state has made a charge against the plaintiff that might seriously damage his or her standing and associations in the community, (ii) the accuracy of the charge is contested, (iii) the charge was publicly disclosed, and (iii) the charge was made in connection with the termination of employment or the alteration of some right or status recognized by state law.  *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002); *see Segal*, 459 F.3d at 212.  To prevail on a "stigma-plus" claim, a plaintiff must also demonstrate that his or her liberty interest in his or her reputation was deprived without due process of law; in other words, "the availability of adequate process defeats a stigma-plus claim." *Segal*, 459 F.3d at 213.  In *Segal*, a case involving an at-will government employee, the Second Circuit held that the availability of an adequate, reasonably prompt, post-termination name-clearing hearing was sufficient to defeat the plaintiff's stigma-plus claim, and that the post-termination hearing procedures at issue were adequate to protect the plaintiff's reputational and professional interests.  *Id.* at 214.  As required by *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Second Circuit balanced (i) the nature of the private interest affected by the government action, (ii) the risk of erroneous deprivation of such interest through the procedures used, and (iii) the government's interests, including the fiscal and administrative burden that additional or substitute procedural requirements might entail.  *Segal*, 459 F.3d at 215 (citing *Mathews*, 424 U.S. at 335).  The Second Circuit reasoned that the government's important interests in explaining its employment decisions and in exercising its right to immediately terminate an at-will employee would be unduly impaired if it were required to conduct a pre-termination hearing in every instance in which it provided an explanation for discharging an at-will employee.  *Id.* at 216.  The Second Circuit observed that, if such pre-termination hearings were mandated, the government would have "a powerful incentive to forgo any explanation of its termination decisions, at a cost to the public as well." *Id.*  Thus, the Second Circuit concluded that the right to a meaningful opportunity to clear one's name can be adequately vindicated at a reasonably prompt, post-termination name-clearing hearing.  *Id.* at 217.  The Court is persuaded by the analysis in *Segal*, and because plaintiff here does not challenge the sufficiency

ORDER - 22

1  summary judgment as to plaintiff's procedural due process claim and DISMISSED such

2  claim with prejudice.

3  **F.**     **Claims Based on First Amendment or "Whistleblower" Theory**

4      **1.**     **Retaliation**[15]

5          In general, the government as employer has far broader authority to restrict

6  expression than the government as sovereign.  _See_ _Brewster v. Bd. of Educ. of the_

7  _Lynwood Unified Sch. Dist._, 149 F.3d 971, 978 (9th Cir. 1998); _see also_ _Pickering v. Bd._

8  _of Educ. of Township High School Dist. 205_, 391 U.S. 563, 568 (1968) ("the State has

9  interests as an employer in regulating the speech of its employees that differ significantly

10  from those it possesses in connection with regulation of the speech of the citizenry in

11  general").  "When a plaintiff is a public employee, [the courts] apply a test that balances

12  the government's legitimate administrative interests as an employer against the

13  employee's interests in free speech, to determine whether the government has violated

14  the employee's First Amendment right to speak freely."  _Clairmont v. Sound Mental_

15  _Health_, 632 F.3d 1091, 1101 (9th Cir. 2011).

16          A public employee claiming a First Amendment violation must establish that

17  (i) the plaintiff spoke on a matter of public concern; (ii) the plaintiff spoke outside his or

---

19  of his post-termination name-clearing hearing, he has no viable claim that he was entitled to a better or
20  different pre-termination hearing.

21  [15] Although unclear from the pleadings or plaintiff's briefing, this claim appears to be brought under 42
U.S.C. § 1983, asserting that defendants, under color of state law, deprived plaintiff of his rights under the
First Amendment by discharging him in retaliation for reporting Fischer's improper access to the MX
22  Logic system and for disclosing to council member Lee the substance of e-mails between Hanson and
Planning Director Grumbach.

23

her capacity as a government employee; and (iii) the plaintiff's speech was a substantial

or motivating factor in an adverse employment action.  _Eng v. Cooley_, 552 F.3d 1062,

1070-71 (9th Cir. 2009).  If the plaintiff proves these three elements, the burden passes to

the government to show that either (i) the government's administrative interests outweigh

the plaintiff's interest in commenting on the matters at issue, or (ii) the government

would have reached the same adverse employment decision even in the absence of the

plaintiff's exercise of free speech.  _Id._ at 1070, 1071-72; _see also_ _Gilbrook v. City of_

_Westminster_, 177 F.3d 839, 867 (9th Cir. 1999).  Whether speech is "protected"

constitutes an issue of law, not of fact.  _Marable v. Nitchman_, 511 F.3d 924, 930 (9th Cir.

2007) (citing _Connick v. Myers_, 461 U.S. 138, 148 n.7 (1983)).

      With regard to plaintiff's report of Fischer's improper access to Medina's e-mail

archive system, plaintiff's retaliation claim lacks merit.  Plaintiff was not the first person

to advise Hanson about Fischer's conduct.[16]  Hanson had learned about the situation at

least six days before plaintiff told her about it.  Moreover, in disclosing the information to

Hanson, plaintiff was merely passing along what he had learned from his subordinates,

who were performing their duties as police officers when the wrongdoing was revealed to

them.  Thus, plaintiff's speech cannot be viewed as other than within his capacity as chief

of police, either as reporting to his supervisor the data received from his subordinates or

---

[16] Plaintiff asserts that he raised the "concern and threat of improper and unauthorized access to electronic data and information" in September 2008, January 2009, February 2010, and October 2010.  Chen Decl. at ¶ 59 (docket no. 191).  For support, plaintiff cites Exhibit 29 to his declaration, which consists of various e-mails concerning the e-mail system and/or Medina's website being "down."  Ex. 29 to Chen Decl. (docket no. 191-29).  None of these e-mails relate to unauthorized access, and plaintiff offers no evidence that he expressed any concerns about improper use of the MX Logic system prior to October 26, 2010.

1    as advising Medina's City Manager of potentially criminal behavior perpetrated by one of

2    Medina's employees.  *See* *Marable*, 511 F.3d at 929 ("when public employees make

3    statements pursuant to their official duties, those statements do not receive First

4    Amendment protection").

5            For the same reason, plaintiff cannot base a retaliation claim on his disclosure to

6    council member Lee of Hanson's e-mail correspondence with Grumbach.  "[T]he inquiry

7    into whether employee speech is pursuant to employment duties is a practical one."

8    *Marable*, 511 F.3d at 932.  Here, plaintiff does not dispute that he had a responsibility as

9    chief of police to propose a budget pursuant to which Medina's law enforcement needs

10   would be met.  *See* Ex. 65 to Chen Decl. (docket no. 191-65) (chief of police "establishes

11   financial budget and priorities for utilizing resources").  Plaintiff also appears to agree

12   that the allocation of funds to another department might impact the amount available to

13   the police department, and that plaintiff would therefore have an interest, as chief of

14   police, in exposing any items, like salary increases, that are inappropriately incorporated

15   into another department's budget.  *See* Chen Dep. at 307:8-308:1, Ex. A to Holt Decl.

16   (docket no. 158-1 at 67-68).  Although plaintiff seeks to cast his disclosure to council

17   member Lee as resulting from an ethical or moral decision,[17] the fact remains that

18   _____

19   [17] In his deposition, in response to defendants' attorney's question concerning whether plaintiff thought
     that reporting the e-mails was part of his job, plaintiff indicated:

20
             That's a good question you are asking.  I think it's more of a moral dilemma first and
21           foremost of anything.  When I know that something's been told to an individual by their
             supposedly policy board or their governors, and for me to end up stumbling -- if that's a
22           word I can use -- onto that information, I think, as I testified earlier, I actually had the
             information for a couple days, if not a week, and it was troubling to me.  It was a

23

1   plaintiff would not have even had such discussion were he not chief of police.  As

2   plaintiff has indicated, council member Lee sought plaintiff's input concerning budget

3   matters in his capacity as chief of police, because she "want[ed] to make sure that

4   appropriate cuts were made in the right areas."  Chen Dep. at 307:20-21 (docket no. 158-

5   1 at 67).  Plaintiff's advice was sought not as a mere citizen, but rather as the head of a

6   department that would be impacted by any budget reduction.

7         Plaintiff compares himself to the engineer for the Washington State Ferries

8   ("WSF") in *Marable*, whose complaints about the corrupt practices of WSF management

9   to the WSF Maintenance Director, the WSF CEO, the Department of Transportation

10   auditor, and the State Executive Ethics Board were deemed to be outside his official

11  _____

12       situation where I thought, Can I just close my eyes and unknow what I saw there.  I think
        for sure if I thought it was part of my job I would have immediately reported it, but I
13       didn't.  What transpired was that meeting with Ms. Lee.  Council Member Lee was
        asking me some very difficult budget questions, wanting to make sure that appropriate
14       cuts were made in the right areas, so that the city budget could be balanced properly, and
        it was then I thought it was important, it was the right thing to do by me to divulge that
        information because if somebody else -- if a program of mine got cut where I ended up
15       getting an officer hurt as a result of it, that's not something I could support.

16  Chen Dep. at 307:8-308:1 (docket no. 158-1 at 67-68).  Plaintiff further explained:

17       Well, again, I am listening very carefully to what you phrase, and in my view of how I
        heard you just say that, that clouds the issue.  I am trying to make a very distinct
18       delineation for the record that I had an ethical, moral dilemma that I held to myself for a
        week, three days to a week.  If I thought it was my job as the police chief at that exact
        second I would have reported it to the mayor or deputy mayor or city council.  I did
19       not, because I was -- because I viewed it as, this is a moral issue, an ethical issue, that I
        thought that the city manager was being dishonest to the city council and the taxpayers of
20       the city when she had been given direction, and so could I have turned a blind eye?  I
        could have made that decision and never mentioned it.  I could have, but I didn't because
21       Ms. Lee had been asking me questions, Where can we cut?  The budget's in a dire
        situation.  We need to be very conservative.  And it was at that point, because of that, that
        I felt, okay, well, then I need to disclose that to her.

22  *Id.* at 308:13-309:7 (docket no. 158-1 at 68-69).

23

ORDER - 26

duties.  511 F.3d at 929-33.  Plaintiff's analysis is flawed.  In _Marable_, the Ninth Circuit

discussed two preceding cases, _Garcetti v. Ceballos_, 547 U.S. 410 (2006), and _Freitag v._

_Ayers_, 468 F.3d 528 (9th Cir. 2006).  In _Ceballos_, the plaintiff was a deputy district

attorney who authored a memorandum to his superiors recommending that a certain case

be dismissed.  The plaintiff later sued, alleging that he was reassigned, transferred, and

denied a promotion in retaliation for such memorandum and related communications.

The United States Supreme Court held that the plaintiff's expressions did not qualify as

protected speech because they were made as part of the deputy district attorney's official

duties.  _See_ 547 U.S. at 421-22 ("Restricting speech that owes its existence to a public

employee's professional responsibilities does not infringe any liberties the employee

might have enjoyed as a private citizen.  It simply reflects the exercise of employer

control over what the employer itself has commissioned or created.").

  In _Freitag_, the plaintiff was a former correctional officer who, during her tenure at

the California Department of Corrections and Rehabilitation ("CDCR"), had submitted

numerous disciplinary reports and "128 Forms" detailing incidents in which inmates

engaged in improper sexual exhibitionist behavior.  Plaintiff's supervisors repeatedly

discarded the plaintiff's 128 Forms and declined to discipline the inmates.  The plaintiff

complained about her supervisors to the warden, an associate warden, the director of the

CDCR, a California state senator, and the California Office of the Inspector General

("COIG").  Relying on _Ceballos_, the Ninth Circuit differentiated between the plaintiff's

complaints to prison administrators (the warden and associate warden) and her

communications with those outside the prison system (state senator and COIG).  _Freitag_,

468 F.3d at 545-46.  The Ninth Circuit concluded that the plaintiff's complaints to prison administrators, asserting her supervisors' actions "undermined" her "authority and discretion," *id.* at 533, were related to her job duties, which included reporting inmate misconduct and pursuing appropriate discipline.  *Id.* at 546; *see* *Marable*, 511 F.3d at 932.

In *Marable*, because the plaintiff had no official duty to ensure that his supervisors refrained from corrupt practices, the Ninth Circuit viewed the plaintiff's complaints in *Marable* as analogous to the communications that the plaintiff in *Freitag* had with the state senator and COIG, which was done in her role "*as a citizen* to expose such official malfeasance to broader scrutiny."  *Freitag*, 468 F.3d at 545 (emphasis in original); *see* *Marable*, 511 F.3d at 932 (plaintiff's "job was to do the tasks of a Chief Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher level officials whom he purportedly thought were abusing the public trust and converting public funds to their own use by overpayment schemes").  Plaintiff in this case bears no resemblance to the plaintiff in *Marable*.  Rather, plaintiff here is similar to the plaintiff in *Ceballos*, and his actions are analogous to those of the plaintiff in *Freitag* in reporting her supervisors' behavior through the chain of command.

Indeed, plaintiff's communications with council member Lee can be viewed as both (i) reporting the alleged misconduct of his supervisor to one of his supervisor's supervisors, *see* RCW 35.18.010 ("The council shall appoint an officer whose title shall be 'city manager' who shall be the chief executive officer and head of the administrative branch of city or town government.  The city manager shall be responsible to the council

1   for the proper administration of all affairs of the city or town."); and (ii) providing input

2   in the budgeting process during which plaintiff played a vital role as chief of police.

3   Plaintiff's suggestion that he was acting as a citizen, rather than as chief of police, in

4   speaking with council member Lee is belied by his explanation of how he discovered the

5   e-mails between Hanson and Grumbach in the first place.  Plaintiff indicates that he

6   searched Medina's e-mail archives for messages containing the word "budget" in the

7   subject line, _see_ Chen Dep. at 119:7-25, Ex. A to Holt Decl. (docket no. 158-1 at 31), and

8   that he had authorization to do so as part of his responsibilities as chief of police, _see_

9   Chen Decl. at ¶ 54 (docket no. 191).  The Court concludes that, as a matter of law, to the

10   extent plaintiff was carrying out his duties as chief of police in obtaining the e-mails, he

11   could not be acting in some other capacity in disclosing them to council member Lee.

12   For the foregoing reasons, the Court has GRANTED defendants' motion for summary

13   judgment as to plaintiff's retaliation in violation of the First Amendment claim and

14   DISMISSED such claim with prejudice.

15           **2.      Retaliatory Discharge in Violation of RCW 49.60.210(2)**

16           RCW 49.60.210(2) declares that "[i]t is an unfair practice for a government

17   agency or government manager or supervisor to retaliate against a whistleblower as

18   defined in chapter 42.40 RCW."  A "whistleblower" is statutorily defined as an employee

19   "who in good faith reports alleged improper governmental action to the auditor or other

20   public official, as defined in subsection (7) of this section, initiating an investigation by

21   the auditor" or who is perceived by the employer as doing so.  RCW 42.40.020(10)(a).  A

22   "whistleblower" also includes an employee "who in good faith provides information to

23

ORDER - 29

the auditor or other public official . . . in connection with an investigation" or who is believed to have done so, and an employee "who in good faith identifies rules warranting review or provides information to the rules review committee" or who is believed to have done so.  RCW 42.40.020(10)(b)(i)&(ii).  "Public official" means the attorney general's designee, the director or equivalent of the agency where the employee works, individuals designated to receive whistleblower reports by the head of the agency, or the executive ethics board.  RCW 42.40.020(7).

With regard to Hanson's alleged malfeasance involving salary increases, plaintiff makes no showing that he made a report or provided information to the auditor or a public official or was believed by defendants to have done so.  With regard to Fischer's improper access to the MX Logic system, plaintiff fails to explain how Fischer's conduct constitutes "improper _governmental_ action."  Moreover, neither of plaintiff's disclosures initiated or was in connection with an investigation by the auditor.  Because plaintiff fails to present evidence on an essential element of his claim, namely that he qualifies as a "whistleblower," as to plaintiff's claim pursuant to RCW 49.60.210(2), the Court has GRANTED defendants' motion for summary judgment and DISMISSED such claim with prejudice.  _See_ _Marable v. Nitchman_, 262 Fed. Appx. 17, 22 (9th Cir. 2007) (affirming district court's dismissal of whistleblower claim for failure to satisfy definition of whistleblower).

### 3.    Discharge in Violation of Public Policy

Washington courts have created an exception to the common law rule that employment contracts are terminable at will by either party; an employer may be liable in

1   tort for discharge of an employee that contravenes a "clear mandate of public policy."

2   *E.g.*, *Bennett v. Hardy*, 113 Wn.2d 912, 922, 784 P.2d 1258 (1990).  Such actionable

3   terminations of employees fall into four general categories:  (i) firing for refusal to

4   commit an illegal act; (ii) firing for performance of a public duty or obligation; (iii) firing

5   for exercise of a legal right or privilege; or (iv) firing in retaliation for reporting employer

6   misconduct (whistleblowing).  *Bricker v. Jackpot Convenience Stores, Inc.*, 1999 WL

7   1211452 at *6 (Wash. Ct. App. Dec. 17, 1999) (quoting *Reninger v. Dep't of*

8   *Corrections*, 134 Wn.2d 437, 447, 951 P.2d 782 (1998)).  For the reasons that plaintiff's

9   retaliation in violation of the First Amendment and whistleblower claims have been

10   dismissed, plaintiff's claim of discharge in violation of public policy is also DISMISSED

11   with prejudice.

12   **Conclusion**

13        For the foregoing reasons, the Court has GRANTED summary judgment in favor

14   of defendants as to plaintiff's hostile work environment, breach of employment policy,

15   procedural due process, and First Amendment/whistleblower claims, and DISMISSED

16   such claims with prejudice.

17        IT IS SO ORDERED.

18        Dated this 31st day of January, 2013.

19

20   THOMAS S. ZILLY
    United States District Judge

21

22

23

ORDER - 31