1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

8

9

10

JEFFREY CHEN,

               Plaintiff,

     v.

CITY OF MEDINA, et al.,

               Defendants.

C11-2119 TSZ

ORDER

11      THIS MATTER comes before the Court on defendants' motion for a new trial,

12 docket no. 361.  Having reviewed all papers filed in support of and in opposition to the

13 motion,[1] and having heard the arguments of counsel,[2] the Court enters the following

14 order.

15 **<u>Background</u>**

16      In this action, plaintiff Jeffrey Chen, former chief of police for City of Medina,

17 brought several causes of action against City of Medina, City Manager Donna Hanson,

18

19

20

21

22

[1] By oral ruling, <u>see</u> Minutes (docket no. 407), defendants' motion, docket no. 400 at 7 n.14, to strike the Declaration of Jeffrey Chen, docket no. 391, was granted.  Plaintiff's declaration contains information regarding his efforts to seek employment after the jury rendered its verdict in this case.  Such information was not before the jury and is not appropriate for consideration on a motion for new trial.

[2] During the hearing on July 10, 2013, plaintiff's counsel objected to defendants' attorney's repackaging of the arguments presented in connection with defendants' motion for a new trial.  Defendants' counsel did not, however, raise any new or untimely contentions, and plaintiff's counsel's complaint lacks merit.

23

ORDER - 1

1   and former Mayor Bret Jordan.  As a result of the Court's rulings on dispositive motions,

2   Jordan was dismissed as a defendant, Order (docket no. 209), and the only claims that

3   survived for trial were plaintiff's claims of race and/or national origin discrimination

4   under state and federal law and his claim of a substantive due process violation brought

5   pursuant to 42 U.S.C. § 1983.[3]

6          After a two-week trial, a jury returned a verdict in favor of plaintiff on all of his

7   remaining claims.  With respect to plaintiff's federal law claims, the Court determined

8   the amount of economic damages and issued Findings of Fact and Conclusions of Law

9   ("FF&CL").  With regard to plaintiff's claim under the Washington Law Against

10  Discrimination ("WLAD"), the jury awarded back pay (lost wages and lost benefits) in

11  the amount of $285,480.  Verdict (docket no. 325).  Based on plaintiff's concession that

12  the jury's back pay calculation was not consistent with the evidence, the Court remitted

13  the amount of back pay on plaintiff's WLAD claim to $237,944.  *See* FF&CL at n.3

14  (docket no. 344).  The jury also awarded $1,650,000 in front pay on plaintiff's WLAD

15  claim, $100,000 in emotional harm damages on all of plaintiff's claims, and $25,000 in

16  punitive damages against Hanson on plaintiff's federal claims.  *See* Verdict (docket

17  no. 325).  Defendants now move for a new trial.

18

19  [3] The Court granted summary judgment against plaintiff on his various conspiracy claims, Order (docket
    no. 209), as well as on his hostile work environment, breach of employment policy, procedural due

20  process, First Amendment, and "whistleblower" claims, Order (docket no. 251), and dismissed all of
    those causes of action with prejudice.  To the extent plaintiff's counsel was arguing at the hearing on
    July 10, 2013, that the Court's Orders, docket nos. 209 & 251, dismissing most of plaintiff's claims

21  somehow gave more credence to plaintiff's remaining discrimination and substantive due process claims,
    such contention is far from accurate.  If anything, the lack of merit in the claims as to which defendants

22  were granted summary judgment and plaintiff's shift from "whistleblower" accusations to allegations of
    racial animus undermine the strength of plaintiff's claims of discrimination.

23

ORDER - 2

1    City of Medina operates under a council-manager form of government.  The

2    council is comprised of seven at-large members, one of whom is selected to serve as

3    mayor for a two-year term.  The council selects a city manager, who is imbued with

4    various "powers and duties," including the authority to appoint and remove department

5    heads, officers, and employees.  RCW 35A.13.080.  In particular, the chief of police is

6    appointed by and is under the "general supervision and control" of the city manager.

7    Medina Mun. Code § 2.16.030.  When plaintiff first joined the Medina Police

8    Department in 2001, at the rank of captain, Michael Knapp was chief of police.

9    Tr. (Mar. 13, 2013) at 142:4-8.  In 2004, after Knapp's retirement, plaintiff was appointed

10   chief of police by then City Manager Douglas Schulze.  _Id._ at 146:14-16.  Hanson

11   became city manager in November 2008.  _Id._ at 173:4-11.  Jordan was a member of the

12   City Council from 2008 until 2011, and served as mayor from 2010 to 2011.

13   Tr. (Mar. 20, 2013) at 80:19-24.

14   Before Hanson became city manager in November 2008, City of Medina was

15   embroiled in various controversies, including the discharge in 2006 of Medina Police

16   Lieutenant Roger Skinner for stating _inter alia_ that "Asians don't make good managers,"

17   and the censure in October 2008 of Medina City Council member Lucius Biglow for

18   distributing an offensive parody written in the style of J.K. Rowling's "Harry Potter"

19   books.  Prior to trial, the Court excluded evidence concerning these discriminatory

20   comments because they could not be imputed to Hanson or City of Medina in light of,

21   respectively, the timing of events and the corrective action that had been taken.  _See_

22   Order at 10-14 (docket no. 251); Minute Orders (docket nos. 239 & 265).  The Court also

23

ORDER - 3

1    excluded discriminatory remarks made by community members, including Henry

2    Paulman to whom the statement "I don't talk to Orientals" is attributed, and Jordan to

3    whom the comment "I thought Asians had small ones" is ascribed at a time before he was

4    on the City Council or serving as mayor, because the declarant was not at the relevant

5    time an employee, a member of the City Council, or otherwise subject to City of

6    Medina's or Hanson's control.  *See id.*  During the course of trial, beginning with her

7    opening statement, plaintiff's counsel Marianne Jones violated these and other rulings in

8    limine, and the jury was improperly exposed to evidence of racial animus that cannot, as

9    a matter of law, be used to hold either City of Medina or Hanson liable for

10   discrimination.

11            Putting aside the inappropriately proffered comments of individuals who were

12   disciplined for their behavior or with whom defendants have no privity, plaintiff's

13   evidence of discrimination in this matter is virtually nonexistent.  In connection with his

14   claim of discrimination on the basis of race and/or national origin, pursuant to the WLAD

15   and 42 U.S.C. §§ 1981 and 1983, plaintiff alleged three different adverse employment

16   actions:  (i) being forced to resign on December 17, 2010; (ii) being placed on paid

17   administrative leave on December 27, 2010, after attempting to rescind the resignation;

18   and (iii) being terminated on April 27, 2011.

19            Approximately two months before this sequence of alleged adverse employment

20   actions, Central Services Director and City Clerk Rachel Baker was informed that, during

21   October 2010, a City of Medina employee, Craig Fischer, had been improperly accessing

22

23

ORDER - 4

1   City of Medina's e-mail archive system known as MX Logic.[4]  Tr. (Mar. 19, 2013) at

2   3:24-4:8, 12:23-13:6, 13:20-24.  Having learned this information from an information

3   technology consultant to whom Fischer had confided about his behavior, *id.* at 12:23-

4   13:6, Baker investigated and discovered that, in addition to Fischer, one or more

5   unknown individuals were accessing the MX Logic system with a username

6   (*i.e.*, "rachel_prr") that belonged to Baker but that she no longer used, *id.* at 14:10-22.

7   Baker advised Hanson of the situation, *id.* at 14:15, and Nathan Way, a senior network

8   engineer and co-owner of a company known as Datanode LLC, was retained to

9   investigate.  Tr. (Mar. 21, 2013) at 181:1-4, 181:16-182:2.

10       Way's task was to identify the Internet protocol ("IP") addresses outside city hall

11  that were being used to access the e-mail archive.  *See id.* at 185:24-187:18, 195:20-

12  196:2; *see also id.* at 196:14-16.  Way's investigation revealed ten different IP addresses

13  outside city hall, including the Medina Police Department network, through which the

14  MX Logic system was accessed during a two-week period in October 2010.  Ex. 1052

15  (copy filed as Ex. BB to Holt Decl. (docket no. 158-3));  Tr. (Mar. 21, 2013) at 188:17-

16  189:2, 194:13-18.  Using publicly available "reverse Domain Name System" information,

17  Way was able to determine which Internet service provider ("ISP") was associated with

18  each IP address he had identified, *see* Ex. 1052 at Apps. A-J, and he recommended that

---

[4] Fischer is City of Medina's information systems coordinator. Tr. (Mar. 12, 2013) at 176:10. Fischer
has unlimited access to City of Medina's e-mail archive. *Id.* at 183:19. While on paternity leave, as a
result of his concern that his position might be cut for budget reasons, Fischer used the MX Logic system
to view e-mails that were not directed to him. *Id.* at 184:7-11, 188:10-18, 189:2-6, 190:17-19, 192:1-15.
At trial, Fischer testified that, although he has access to the e-mail archive for work-related reasons, his
review of e-mails that did not contain his name in the "to," "cc," or "bcc" line was improper. *Id.* at
178:25-179:15, 181:25-183:3, 185:24-186:14, 201:6-12.

ORDER - 5

1  subpoenas be issued to the respective ISPs, namely Comcast, Issaquah Highlands Fiber

2  Network, and Isomedia, *see id.* at 5,[5] to ascertain which of their subscribers were

3  associated with the various IP addresses.  Tr. (Mar. 21, 2013) at 187:12-18.  According to

4  Dan Yourkoski, who was a lieutenant when plaintiff was chief of police and who became

5  acting chief of police when plaintiff resigned, the only way to obtain a subpoena or

6  search warrant for an ISP's subscriber records was to initiate a criminal investigation.

7  Tr. (Mar. 12, 2013) at 148:4-7, 149:2-5.  Because, however, the Office of the United

8  States Attorney for the Western District of Washington decided not to pursue a criminal

9  investigation, City of Medina was unable to procure a subpoena or search warrant to

10  assist in identifying who had used the external IP addresses enumerated in Way's report

11  to access the e-mail archive.

12      A copy of Way's report was forwarded to attorney Michael Bolasina, who was

13  retained by City of Medina to provide legal advice concerning the unauthorized use of the

14  e-mail archive.  Tr. (Mar. 19, 2013) at 48:18-50:1.  Way's report indicated that

15  "rachel_prr" had been used to log into the MX Logic system from three external IP

16  addresses, namely from the Medina Police Department network and from the computers

17  of Clearwire and Comcast subscribers.  *Id.* at 48:25-49:6; *see also* Tr. (Mar. 21, 2013) at

18

19

20  ---

[5] Way did not make a similar recommendation concerning the ISP associated with two IP addresses

21  beginning with the numbers 184.77 and 184.78 because the ISP, namely Clearwire, does not maintain the
   records necessary to identify the subscriber for more than seven days, and that amount of time had already

22  elapsed between the questionable access to the MX Logic system and the issuance of Way's report.  *See*
   Ex. 1052 at 19.

23

186:22-187:2.  Bolasina was informed that, in 2009, Baker had given the username "rachel_prr" and associated password to plaintiff.[6]  Tr. (Mar. 19, 2013) at 49:3-9.

On December 8, 2010, Bolasina interviewed Fischer about accessing the MX Logic system.  *Id.* at 60:9-11.  Fischer admitted logging into the e-mail archive from an external IP address, while he was on paternity leave, but indicated that he did not do so from either the Medina Police Department network or the IP addresses associated with Clearwire and Comcast.  *Id.* at 61:5-13, 62:8-16.

On December 15, 2010, accompanied by Baker, Bolasina interviewed plaintiff. *Id.* at 62:19-20; 63:3-4.  According to Bolasina, after Bolasina explained to plaintiff that he was investigating unauthorized access to the MX Logic system during October 2010 from three points, *i.e.*, the Medina Police Department network and the Clearwire and Comcast IP addresses, plaintiff volunteered that he did not have a username or password for the e-mail archive.  *Id.* at 64:11-20.  At trial, Bolasina testified that, because he was concerned he was not clearly communicating with plaintiff, he paused and expressed his understanding that, sometime during the previous year, Baker had given a username and password to plaintiff; in response, plaintiff denied ever receiving a username and password from Baker.  *Id.* at 65:6-18, 83:17-84:21, 88:15-89:18.

---

[6] At trial, Baker explained that, after business hours one evening in 2009, plaintiff approached her, indicated that he was conducting an investigation, and asked for immediate access to the e-mail archive. Tr. (Mar. 19, 2013) at 10:6-15.  Baker was uncomfortable with plaintiff's request and she hesitated, but she eventually gave plaintiff her own user name and password for the MX Logic system.  *Id.* at 10:16-11:3, 12:9-12.

ORDER - 7

1   After the interview, Bolasina prepared a draft written statement memorializing his

2   understanding of plaintiff's interview responses, and he e-mailed a copy to plaintiff for

3   review and comment.  _Id._ at 68:16-71:2; _see_ Ex. 1102; _see also_ Ex. 173.  The draft

4   written statement contained a denial that plaintiff had ever been supplied a username or

5   password for the MX Logic system and a denial that plaintiff had ever accessed the e-

6   mail archive for any reason.  Ex. 1102 (copy filed as Ex. EE to Holt Decl. (docket

7   no. 158-4)).[7]  Plaintiff did not immediately respond to Bolasina's e-mail.  Tr. (Mar. 19,

8   2013) at 72:1-8.  Instead, two days later, on December 17, 2010, during a meeting in

9   Hanson's office, plaintiff tendered a letter of resignation as City of Medina's chief of

10  police.  Ex. 182.  At trial, plaintiff and Hanson provided vastly different accounts of what

11  transpired during the meeting on December 17, 2010.  Six days later, on December 23,

12  2010, plaintiff sent Hanson a letter rescinding his resignation.  Ex. 213.  On December

13  27, 2010, plaintiff was placed on paid administrative leave.  Ex. 221.

14  Following an investigation conducted by attorney Ellen Lenhart, _see_ Ex. 1074, and

15  a pre-termination hearing as contemplated in _Cleveland Bd. of Educ. v. Loudermill_, 470

16

---

17  [7] The draft written statement contained the following two paragraphs:

18      6.   Mr. Bolasina said that he was under the impression that I had been given, at some
         time in the past, the log in "Rachel_prr" and a password in order to review emails in the

19      City's email archive.  I clarified that this was incorrect.  I have never been given a log in
         or password to the City's email archive at any time, for any reason.

20      8.   As I told Mr. Bolasina, I have never accessed the City's email archive for any
         reason.  Nor have I used a log in or password for the City's email archive for any purpose

21      whatsoever.  None of the accesses of the City's email archive using the Comcast account,
         the police department network, and the Clearwire wireless network, have anything to do
         with me.

22  Ex. 1102.

23

ORDER - 8

1    U.S. 532 (1985), _see_ Ex. 364, plaintiff was discharged by Hanson on April 27, 2011, via

2    written notice identifying six reasons for the decision, including making false statements

3    to Bolasina and Lenhart, _see_ Ex. 385.  This litigation commenced near the end of 2011,

4    and trial concluded with a verdict on March 26, 2013.  The Court entered judgment,

5    docket no. 345, on April 9, 2013.  Defendants filed a timely motion for judgment as a

6    matter of law, which was denied, _see_ Minute Order (docket no. 406), and a concurrent

7    alternative motion for a new trial, docket no. 361, which is hereby GRANTED for the

8    reasons set forth below.

9    **Discussion**

10          A trial judge is ultimately responsible for the conduct of the litigation and for

11   ensuring that a party is not a victim of a miscarriage of justice.  _Murphy v. City of Long_

12   _Beach_, 914 F.2d 183, 187 (9th Cir. 1990).  To enable the trial court to discharge this

13   important duty, the Federal Rules of Civil Procedure authorize the Court to grant a new

14   trial, either upon a party's motion or _sua sponte_.  _See_ Fed. R. Civ. P. 59(a)(1)(A) & (d);

15   _see also_ _Murphy_, 914 F.2d at 187.  A new trial may be ordered for a variety of reasons,

16   including (i) a verdict contrary to the great weight of the evidence, _Rattray v. City of_

17   _Nat'l City_, 51 F.3d 793, 800 (9th Cir. 1994); (ii) an excessive jury award, _Hanson v. Shell_

18   _Oil Co._, 541 F.2d 1352, 1359, 1360-61 (9th Cir. 1976); (iii) attorney misconduct during

19   trial, _Anheuser-Busch, Inc. v. Natural Beverage Distribs._, 69 F.3d 337, 346 (9th Cir.

20

21

22

23

ORDER - 9

1    1995); and (iv) evidentiary and/or instructional error affecting a party's substantial rights,

2    *see* Fed. R. Civ. P. 61[8]; *see also* *Murphy*, 914 F.2d at 187 & n.7.

3            The undersigned judge has a deep respect for the jury process and, in twenty-five

4    years on the bench, has never granted a new trial (as opposed to a remittitur with the

5    option of a new trial).  The prospect of enduring a retrial of this matter is not a pleasing

6    one, and the decision has not been made lightly or improvidently.  The undersigned judge

7    was completely surprised by the jury verdict in this case, and can only conclude that it

8    was the product of passion and/or prejudice.  Having carefully reviewed the entire trial

9    transcript, which was provided to the Court by the court reporter, the Court concludes

10   that at least three of the four independent grounds described above are present in this

11   case, and the Court is left with the firm conviction that a new trial is required to prevent a

12   miscarriage of justice.

---

15   [8] In their motion for a new trial, defendants alluded to the Court's exclusion of evidence concerning plaintiff's settlement with his prior employer, the Seattle Police Department ("SPD"), and the reasons underlying plaintiff's resignation from SPD as a basis for ordering a new trial.  Defendants, however, did not develop this argument in the legal analysis section of their motion or in their reply, and they did not even mention it during their initial argument at the hearing on July 10, 2013.  The SPD evidence was relevant as to both liability on the substantive due process claim and future damages on all claims, providing a reason other than defendants' actions for the difficulty that plaintiff has encountered in securing employment.  The Court, however, deemed the SPD evidence to be more prejudicial than probative, particularly given that, before plaintiff was appointed chief of police, City of Medina was aware of the underlying facts giving rise to SPD's investigation, which was initiated prior to, but abandoned after, plaintiff's resignation from SPD.  *See* Fed. R. Evid. 403.  In their motion for a new trial, defendants have not indicated why, even assuming the SPD evidence should have been admitted, justice would require a new trial on that basis.  *See* Fed. R. Civ. P. 61.  In light of the Court's ruling regarding the other grounds for a new trial, the Court declines to further consider whether any evidentiary error would also justify a new trial.  Prior to another trial of this matter, however, the Court will address whether the case should be bifurcated, with liability on the discrimination claims tried first, and liability on the substantive due process claim and damages tried subsequently, and whether the SPD evidence should be allowed during the second, but not the first, phase of the trial.

ORDER - 10

A. __Verdict Contrary to Evidence__

Although the existence of substantial evidence to support a jury verdict precludes the Court from granting judgment as a matter of law ("JMOL"), it does not prevent the Court from ordering a new trial if the verdict is against the clear weight of the evidence. _Landes Constr. Co. v. Royal Bank of Canada_, 833 F.2d 1365, 1371 (9th Cir. 1987). Unlike in the JMOL context, with respect to a new trial motion, the Court need not view the evidence in the light most favorable to the non-moving party.  _Id._  Instead, in deciding whether to grant a new trial, the Court may, and indeed has a duty to, weigh the evidence and assess the credibility of the witnesses.[9]  _Id._; _see_ _Molski v. M.J. Cable, Inc._, 481 F.3d 724, 729 (9th Cir. 2007) (quoting _Murphy v. City of Long Beach_, 914 F.2d 183, 187 (9th Cir. 1990) (quoting _Moist Cold Refrigerator Co. v. Lou Johnson Co._, 249 F.2d 246, 256 (9th Cir. 1957))).  The Court's inquiry is whether, giving full respect to the jury's

---

[9] Plaintiff incorrectly contends that the following standard applies:

> The inferences to be drawn from the evidence are for the jury and not for this court.  The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, _the reviewing court_ will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.

_Passantino v. Johnson & Johnson Consumer Prods., Inc._, 212 F.3d 493, 511 (9th Cir. 2000) (emphasis added) (quoting _Herring v. Dep't of Soc. & Health Servs._, 81 Wn. App. 1, 16-17, 914 P.2d 67 (1996) (quoting _Burnside v. Simpson Paper Co._, 123 Wn.2d 93, 108, 864 P.2d 937 (1994) (quoting _State v. O'Connell_, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)))).  Contrary to plaintiff's assertion, the standard described in _Passantino_ does not govern on a motion for a new trial, but rather applies to an appellate court's review of a jury's verdict.  In _O'Connell_, from which the above language stems, the Washington Supreme Court decided a case in which the trial court had denied motions for judgment notwithstanding the verdict and for a new trial, leaving "the verdict of the jury . . . before us, reinforced by the trial judge's approval, or, if not approval, his recognition that there is no reason why the verdict should be set aside." 83 Wn.2d at 839.  Likewise, in _Passantino_, on which plaintiff relies, the Ninth Circuit was articulating the doctrines related to its review of the jury's verdict, the trial court having denied the defendant's motion for judgment as a matter of law or in the alternative for a new trial.  212 F.3d at 504.

ORDER - 11

findings and considering all of the evidence, the Court is left with "the definite and firm conviction that a mistake has been committed." *Landes Constr.*, 833 F.2d at 1371; *see* 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FED. PRAC. & PROC. § 2806 & n.26 (3d ed. 2012) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (applying a similar test for when a reviewing court may upset a trial court's finding of fact in a nonjury case)).

In evaluating whether a new trial is warranted in this case, the Court must consider whether any of the following jury findings are against the great weight of the evidence: (i) that plaintiff was compelled by Hanson to resign; (ii) that race and/or national origin was a substantial factor[10] in the adverse employment actions at issue; and (iii) that defendants would not have engaged in the same adverse employment actions even if race and/or national origin had played no role in the decisions.  The Court is mindful that, with respect to the first two inquiries, plaintiff had the burden of proof by a preponderance of the evidence, while as to the third issue, defendants were required to demonstrate, by clear and convincing evidence as to the state law claim and a preponderance of the evidence as to the federal law claims, that their employment decisions would have been the same if premised solely on one or more legitimate, non-discriminatory reasons.  *See*

---

[10] Pursuant to the agreement of counsel, the jury was instructed that, to prevail on his WLAD, § 1981, and § 1983 claims, plaintiff was required to prove by a preponderance of the evidence that race and/or national origin was a "substantial factor," as opposed to a "motivating factor," in the decision to engage in the adverse employment action at issue.  *See* Minute Order at 2 n.1 (docket no. 318); Instr. Nos. 12, 13, & 14 (docket no. 321); *see also* Wash. Pattern Instr. ("WPI") 330.01 ("substantial factor"); 9th Cir. Model Instr. 10.1C ("motivating factor").  A "substantial factor" means a significant motivating factor, but does not mean the only or even the main factor in bringing about the adverse employment action.  *See* WPI 330.01.01; *see also* *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 72-75, 821 P.2d 18 (1991).

Ex. A to Minute Order (docket no. 277 at 24 & 26) (discussing _Davis v. Dep't of Labor &_ _Indus._, 94 Wn.2d 119, 615 P.2d 1279 (1980); _Metoyer v. Chassman_, 504 F.3d 919 (9th Cir. 2007); _Mustafa v. Clark County Sch. Dist._, 157 F.3d 1169 (9th Cir. 1998)).

### 1. **Forced Resignation**

With respect to the allegedly forced resignation, plaintiff and Hanson have offered vastly different accounts of the events of December 17, 2010. According to plaintiff, after a heated argument with Hanson about whether plaintiff had authority to access City of Medina's e-mail archive, Hanson said to plaintiff, "I've got the support of the Mayor, and I could fire you right now." Tr. (Mar. 14, 2013) at 95:21-96:11. Plaintiff testified that Hanson then gave him an ultimatum: "Do you want to get fired, or do you want to quit, or do you want to be put on admin[istrative] leave?" _Id._ at 96:21-23. Plaintiff indicated that, in an angry and emotionally hurt state, he grabbed a piece of paper from Hanson's printer and scrawled out a resignation letter. _Id._ at 97:1-5. He then took the resignation letter from Hanson's office, went back to his office and photocopied it, and returned to Hanson's office with various items, including keys and badges. _Id._ at 97:13-99:17.

In contrast, Hanson testified that plaintiff arrived at her office in the afternoon on December 17, 2010, with two envelopes of different sizes. Tr. (Mar. 20, 2013) at 153:16-24. Plaintiff handed Hanson both envelopes; the smaller envelope contained plaintiff's hand-written letter of resignation. _Id._ at 153:25-154:2. The letter undisputedly read:

> I hereby tender my 2 week resignation effective December 31, 2010.
> I have chosen another opportunity to finish my working career.
> I wish you and the City of Medina the best in the future.

ORDER - 13

Ex. 182 (copy filed as Ex. HH to Holt Decl. (docket no. 158-4)).  Hanson expressed

"shock" at receiving plaintiff's resignation.  Tr. (Mar. 20, 2013) at 154:3.  According to

Hanson, plaintiff left her office and did not return.  *Id.* at 154:10-20.  After mentioning to

Baker,[11] who was at the time with Bolasina, that plaintiff had just resigned, Hanson

inventoried the contents of the larger envelope.  *Id.* at 154:13-155:1.  When asked at trial,

Hanson indicated that, given the layout of her office, a person could not have grabbed

paper from her printer as plaintiff had described, and she denied pressuring plaintiff into

resigning.  *Id.* at 155:20-156:4.

The Court had an opportunity to observe both plaintiff and Hanson while they

testified.  Of the two witnesses, plaintiff was by far the more polished and professional in

demeanor.  The Court, however, did not doubt Hanson's credibility, and the jury's verdict

cannot be explained as merely declaring plaintiff the winner in a swearing match.  Based

solely on the substance and tenor of plaintiff's resignation letter, which is inconsistent

with his story about its creation, Hanson's account of events cannot be discounted.  The

resignation letter indicated that "another opportunity" was plaintiff's reason for leaving

City of Medina and, in the letter, plaintiff wished Hanson well in the future.  Language of

this nature would not be expected to appear in a letter forged in the heat of the moment

under the type of duress plaintiff alleged.

---

[11] Baker testified that plaintiff came to Hanson's office armed with a large envelope, was informed that Hanson was not in her office, and said he would come back later. Tr. (Mar. 19, 2013) at 21:16-22:16. Baker's version corroborates Hanson's account of events.  Baker, however, was impeached by plaintiff's counsel with deposition testimony indicating a lack of recollection about the envelope, *id.* at 27:13-30:7, and the Court therefore has not relied on Baker's testimony on this particular point.

Similarly, an e-mail that plaintiff distributed shortly after his meeting with Hanson on December 17, 2010, belies plaintiff's assertion of a compelled resignation.  In the e-mail, which was sent to all members of the Medina Police Department, plaintiff indicated that he had "decided to pursue other opportunities" and had tendered his two-week "notice of resignation" to Hanson.  Ex. 8 to Lenhart Report, Ex. 1074; *see also* Ex. 184.  The representations made in the e-mail, contemporaneously with plaintiff's resignation, are not consistent with his subsequent accusation that Hanson forced him to resign.

Moreover, other witnesses who spoke with plaintiff shortly after his resignation testified that plaintiff made no mention of any coercion by Hanson.  Medina City Council member Douglas Dicharry spoke with plaintiff about two weeks after his resignation, and plaintiff explained that he "couldn't work with [Hanson]."  Tr. (Mar. 15, 2013) at 138:24-139:7.  Rather than attributing the resignation to any ultimatum from Hanson, plaintiff mentioned to Dicharry "something about [Hanson] wouldn't allow him to buy tires for the police cars, and his officers -- he was concerned about officer safety and safety of the community."  *Id.* at 139:9-12.  Plaintiff said nothing to Dicharry about a forced resignation.  *Id.* at 140:6-7.  Likewise, Medina City Council member Katherine Phelps indicated that, three to four days after his resignation, plaintiff told her that "he had grown weary of working with Donna Hanson, . . . he had another opportunity to move on to, and that's what he intended to do."  Tr. (Mar. 20, 2013) at 62:13-18.

Jordan testified that he was "shocked" by plaintiff's allegation of a resignation under pressure from Hanson because it "didn't line up with what we talked about in our

1   telephone conversation," which had occurred three or four days after plaintiff resigned.

2   _Id._ at 89:3-15, 92:21-93:6.  Jordan further indicated that he could not understand what

3   leverage Hanson could possibly have had over plaintiff to force him to resign.  _Id._ at

4   99:19-100:7.  Jordan believed that Hanson knew plaintiff had more support in the City

5   Council than she did, and that Hanson understood she would "be fired before our chief

6   will." _Id._  Jordan summed up the situation by stating that "the only thing we couldn't

7   protect him from was his own choice to resign." _Id._ at 99:25-100:1.  This information is

8   consistent with what Hanson told attorney Bolasina sometime prior to plaintiff's

9   resignation, namely that even if she discovered plaintiff had been accessing the

10  MX Logic system inappropriately, she was "not in a position to discipline him because he

11  curries so much favor with the City Council and the citizens of Medina."  Tr. (Mar. 22,

12  2013) at 134:21-135:2.

13       Both Phelps and Jordan expressed dissatisfaction with Hanson's performance as

14  city manager.  Phelps desired stronger leadership, Tr. (Mar. 20, 2013) at 73:19-21, while

15  Jordan wanted Hanson to engage more with the community, _id._ at 87:19-20.  Jordan

16  described Hanson as someone who was not "lighting the world on fire," but who was

17  keeping the train "leaving the station on time every day." _Id._ at 87:18-24.  According to

18  Linda Crum, records manager for the Medina Police Department, plaintiff himself

19  assessed Hanson as weak, and plaintiff predicted, on Hanson's first day as city manager,

20  that the City Council is "going to just be over her," meaning that she would not last long.

21  Tr. (Mar. 13, 2013) at 33:13-15, 82:2-7.  The Court's observation of Hanson's demeanor

22  while testifying is consistent with these evaluations; Hanson lacks the type of

23

assertiveness that might support plaintiff's claim that, on December 17, 2010, she gave him an ultimatum culminating in his resignation.

During her closing statement, plaintiff's counsel argued that a voluntary resignation was nonsensical in light of plaintiff's personal situation at the time, being recently divorced, moving back into his home, having just regained custody of his four children, on the eve of celebrating his daughter's 18th birthday, during the week before Christmas.  Tr. (Mar. 25, 2013) at 10:9-12.  Counsel's analysis is actually stronger proof of the opposite conclusion.  Under plaintiff's version of events, he had the option to be placed on paid administrative leave, which would have afforded him time to find other employment, and given plaintiff's personal situation, his story that he instead impulsively resigned runs contrary to the type of composed decision-making in stressful situations that is expected of a highly-trained law enforcement officer having attained the rank of chief of police.  Hanson's account is far more believable because it, in contrast, contemplates that, when plaintiff resigned, he actually had somewhere else to go and an anticipated means of maintaining his home and caring for his family.

The record also contains evidence indicating plaintiff took steps in advance of his meeting with Hanson on December 17, 2010, that were consistent with an intention to voluntarily resign.  He erased all of the data from the Outlook program on his work computer and iPod Touch, reset his cellular telephone to its factory settings, posted an employee-of-the-year plaque without the usual announcements and fanfare, and canceled a staff meeting scheduled to take place after the date plaintiff resigned.  Tr. (Mar. 22, 2013) at 67:22-71:25.  Similarly, plaintiff's actions after his resignation are incompatible

1    with the claim that the decision was foisted on him.  Within six days after his resignation,

2    plaintiff sent Hanson a letter indicating simply, "Upon reflection I hereby rescind my

3    resignation."  Ex. 213 (copy filed as Ex. LL to Holt Decl. (docket no. 158-4)).  If, as

4    plaintiff asserts, Hanson had actually told him his options were to be fired, be placed on

5    leave, or resign, plaintiff's subsequent letter seems preposterous; if Hanson had indeed

6    made clear that plaintiff would be removed one way or another, she could hardly be

7    expected to welcome him back less than a week later.  The more reasonable explanation

8    is that Hanson never announced any ultimatum, and that plaintiff voluntarily quit and

9    then decided to return.  The Court is persuaded the jury's finding that plaintiff was forced

10   to resign is against the great weight of the evidence, and a new trial on at least this issue

11   is warranted.

12        2.    **Substantial Factor**

13           Even if, however, the jury could have reasonably believed that Hanson forced

14   plaintiff to resign, plaintiff's own testimony did not connect such action to plaintiff's race

15   or national origin, but rather to a dispute over whether plaintiff was authorized to access

16   the MX Logic system.  Tr. (Mar. 14, 2013) at 95:23-96:24.  According to plaintiff,

17   Hanson accused him of having "unauthorized access into these MX Logic archives."  _Id._

18   at 96:2-3.  Plaintiff allegedly responded, "I have authorized access, you know that," _id._ at

19   96:8, and Hanson "[v]ery sharply" did not agree, _id._ at 96:8-9.  The heated conversation

20   "went downhill," _id._ at 96:9, and plaintiff resigned.  Nothing in plaintiff's recounting of

21   the events of December 17, 2010, supports a finding that plaintiff's allegedly compelled

22   resignation resulted from discrimination on the basis of race or national origin.

23

ORDER - 18

1   In attempting to portray Hanson as a racist and to hold City of Medina liable for

2   discrimination, plaintiff relied on four types of evidence:  (i) two statements attributed to

3   Hanson, one of which she denied making; (ii) the statements of others, none of which can

4   be imputed to Hanson; (iii) Hanson's managerial decisions, including the disciplinary

5   treatment of two other Medina employees; and (iv) information allegedly withheld by

6   Hanson from investigators Way, Bolasina, and Lenhart.  Each category of evidence will

7   be discussed seriatim.

8         a.   **<u>Hanson's Statements</u>**

9         Plaintiff's case rests primarily on two statements ascribed to Hanson, one of which

10   is disputed, and neither of which are proximate in time to plaintiff's resignation,

11   placement on administrative leave, or termination.  From the outset of Hanson's tenure as

12   city manager, beginning in November 2008, plaintiff viewed Hanson's behavior as

13   disrespectful, accusing her of regularly arriving 20 to 30 minutes late for staff meetings,

14   of disregarding him by not making "genuine eye contact" with him, and of ignoring him

15   by not asking for his input.  Tr. (Mar. 14, 2013) at 45:19-47:5.  In November 2009, after

16   Hanson had been city manager for approximately a year, during the course of a staff

17   meeting, Hanson asked, "Do you people eat turkey?"  <u>Id.</u> at 49:6-10.  According to

18   plaintiff, on this occasion, in contrast to others, Hanson looked straight at him when

19   posing the question.  <u>Id.</u> at 49:9-10.  Plaintiff interpreted the inquiry as being culturally

20   insensitive.  <u>Id.</u> at 49:16-19.

21         Baker was also present during the meeting and recalled Hanson querying the

22   group about how they celebrate Thanksgiving and whether they ate turkey.  Tr. (Mar. 19,

23

ORDER - 19

1    2013) at 25:14-16.  Baker did not perceive the question as being directed toward plaintiff.

2    _Id._ at 26:1-4.  Baker believed Hanson was being sensitive to Baker's eating habits

3    because she was, at the time, eating only raw vegan food, which did not include turkey.

4    _Id._ at 25:19-21.

5         At trial, Hanson acknowledged inquiring, "Do you eat turkey for Thanksgiving?

6    And if you don't, what do you do?"  Tr. (Mar. 20, 2013) at 147:25-148:2.  She explained

7    that her daughter had started dating a young man whose family didn't like turkey.  _Id._ at

8    147:23-24.  She thought that was "weird," because her family likes turkey, _id._ at 147:24-

9    25, and she thereafter engaged in what she viewed as "casual conversation" concerning

10   whether others enjoyed turkey, _id._ at 148:2-3.  In closing argument, plaintiff's counsel

11   seized on Hanson's use of the term "weird," asserting that Hanson "thinks she's normal,

12   and everyone who is different, or different than her majority, her idea of the majority, is

13   weird."  Tr. (Mar. 25, 2013) at 19:3-5.

14        Even assuming such extrapolation was warranted, the underlying evidence does

15   not demonstrate an animus based on race or national origin or provide any basis for

16   liability on plaintiff's discrimination claims.  As indicated by Baker's testimony, the

17   decision not to ingest turkey, at Thanksgiving or otherwise, might have nothing to do

18   with race or national origin, but could result from food preferences (vegan or vegetarian),

19   aversions, or allergies.  Moreover, the race-neutral question of turkey consumption was

20   posed by Hanson over a year before plaintiff resigned, and it appears to have been an

21   isolated event.

22

23

The other remark attributed to Hanson on which plaintiff relied in accusing her of being ethnocentric was allegedly made in March 2009.  According to plaintiff, he was seeking Hanson's approval on a particular project, and after not receiving any response to numerous requests, he sought her out at her office.  Tr. (Mar. 14, 2013) at 41:23-43:11.  During a short conversation, Hanson allegedly said to plaintiff, "I thought you Chinese people were supposed to be more patient than this."  *Id.* at 43:13-15.

Hanson denied making this comment or any other racially disparaging remark to plaintiff.  Tr. (Mar. 20, 2013) at 148:7-13.  In evaluating whether plaintiff or Hanson is more credible on the issue of whether this offensive comment was uttered, the Court has considered their respective demeanors while testifying, as well as plaintiff's 7-page memorandum to Hanson dated January 27, 2011, his 3-page e-mail to Medina City Council members dated January 29, 2011, his 33-page written response to the report generated by Ellen Lenhart, his 3-page written objection to the *Loudermill* hearing, and his charge filed with the Washington State Human Rights Commission ("WSHRC").  *See* Exs. 270, 280, 376, 374 & 440 (copies filed as, respectively, Exs. 4 & 7 to Lenhart Report, Ex. AAA to Holt Decl. (docket no. 158-5); Exs. DDD, FFF, & III to Holt Decl. (docket no. 158-7)).  Although Hanson was not a strong witness, the Court has no reason to doubt her veracity.  In contrast, plaintiff's pre-suit writings raise serious concerns about his credibility.

In the two documents plaintiff generated in January 2011, which he sent to Hanson and City Council members, respectively, he described himself as a "whistleblower," alleging that he had been targeted in retaliation for reporting Fischer's improper access to

the MX Logic system.  In neither of the January 2011 writings did plaintiff allude to race or national origin as a perceived cause for the alleged adverse employment actions.  In both his response to the Lenhart report and his objection to the _Loudermill_ hearing, plaintiff described in detail the "do you eat turkey" incident, but he did not even mention the comment about "Chinese patience."  Likewise, in the charge filed with the WSHRC, in which plaintiff was required to explain why he believed the actions taken against him were discriminatory, he referred only to the "do you eat turkey" inquiry.  The fact that the "Chinese patience" remark was not included in plaintiff's lengthy pre-termination materials or in his WSHRC charge is evidence of fabrication.  If Hanson had indeed made the ethnic slur, plaintiff would be expected to have remembered it and discussed it in one or more of these pre-litigation documents.[12]  In sum, to the extent the jury found that the "do you eat turkey" statement was racist and/or that Hanson actually made the comment about "Chinese patience," such findings are against the great weight of the evidence.

### b.    Statements of Others

As already discussed, plaintiff's reliance on the offensive remarks of Skinner and Biglow, who were disciplined for their behavior, and of Paulman, who is not a City of Medina employee or otherwise under defendants' control, was improper.  With respect to

---

[12] During her closing argument, Jones indicated that Hanson "doesn't remember saying" she thought "Chinese people were more patient than this."  Tr. (Mar. 25, 2013) at 17:20-24.  By misstating the evidence, Jones avoided dealing with Hanson's unequivocal contradiction of her client's testimony. Counsel for defendants, however, confronted the issue directly in closing remarks, encouraging the jurors to study the aforementioned exhibits.  _Id._ at 55:12-56:5.

ORDER - 22

Jordan, in addition to the improperly introduced comment attributed to him before he was on the City Council or serving as mayor, plaintiff has placed particular emphasis on his alleged use of the terms "cunts" and "runts," while at a tavern outside City of Medina limits. _See_ Tr. (Mar. 18, 2013) at 39:4-13. At trial, Jordan admitted uttering a vulgarity in the context of a story about someone who was passed over for selection as a police officer by a short, heavyset woman who was permitted to go around a barrier rather than surmount it in a physical test. Tr. (Mar. 20, 2013) at 95:21-96:6. Jordan, however, denied employing the word "runt" or referring in any way to minorities while telling this story. _Id._ at 95:16-19, 96:5-6. Plaintiff was not present at the time Jordan employed the offensive term, and no evidence linked Jordan's comments in any way to plaintiff.

Even assuming, however, that Jordan did reference "runts" or minorities within a derogatory statement, the offensive conduct cannot be imputed to Hanson, who did not participate in the discussion and might never have heard about it but for this litigation. Moreover, the comment has no relevance to City of Medina's liability, which was premised solely on Hanson's role as a final policymaker, _see_ Instr. Nos. 13 & 14 (docket no. 321), and not on Jordan's position as mayor. Jordan did not participate in the adverse employment actions at issue, and did not himself have authority to discharge plaintiff. Order (docket no. 209); _see also_ RCW 35A.13.080; Medina Mun. Code § 2.16.030. Thus, Jordan's use of vulgar or insensitive language does nothing to establish that race and/or national origin was a substantial factor in plaintiff's resignation, placement on administrative leave, or termination.

1      During trial, plaintiff also referred to discriminatory comments uttered by former

2  Chief Knapp, including Chen is "a regular Charlie Chan," you can "never trust a smiling

3  Chinaman," and "I bet those hands would be great for picking cotton."  Tr. (Mar. 11,

4  2013) at 9:23-10:7; Tr. (Mar. 14, 2013) at 172:2-15; Tr. (Mar. 25, 2013) at 19:21-20:1.

5  Knapp, however, retired long before Hanson became city manager, and plaintiff proffered

6  no evidence that Hanson even knows Knapp or was ever informed about his offensive

7  remarks prior to this litigation.  Plaintiff instead sought to hold Hanson responsible for

8  these derogatory statements by alleging that Lieutenant Yourkoski repeated them to

9  plaintiff after Knapp retired.  *See id.*  Plaintiff still failed to link the statements to Hanson,

10  offering no basis to believe that Hanson was aware of Yourkoski's behavior or had

11  condoned it.  Indeed, to the extent Yourkoski acted inappropriately, the authority and

12  responsibility for disciplining him was vested in plaintiff, as Yourkoski's supervisor, and

13  not Hanson.  The Court holds that any influence the offensive remarks of individuals

14  other than Hanson might have had on the jury's deliberations and its verdict was

15  improper.

16            **c.**    **Hanson's Managerial Decisions**

17      Plaintiff contends that four of Hanson's managerial decisions demonstrate racial

18  animus on her part:  (i) choosing someone other than plaintiff to serve as acting city

19  manager in her absence; (ii) identifying an area for improvement on plaintiff's annual

20  performance evaluation; (iii) placing Craig Fischer on six months of probation for

21  improperly accessing the MX Logic system; and (iv) placing Jan Burdue on six months

22  of probation for submitting an inaccurate time sheet.  Plaintiff's argument lacks merit.

23

In January 2009, Hanson went on vacation and appointed Planning Director Robert Grumbach to be acting city manager.  Tr. (Mar. 14, 2013) at 30:1-6.  According to plaintiff, prior city managers had typically appointed him to serve as acting city manager in their absence.  _Id._ at 28:16-29:25, 31:15-17.  The city manager, however, has discretion to select anyone to be acting city manager.  _Id._ at 31:13-14.  Plaintiff provided no evidence that Hanson was aware of the previous practice, and in fact indicated that Hanson had not made any inquiry of him concerning how the situation had been handled in the past.  _Id._ at 32:5-7.  At trial, Hanson explained that she chose Grumbach to serve as acting city manager because he was familiar with the "business," as opposed to the law enforcement, side of City of Medina's work, he was physically located in City Hall, while others including plaintiff were not, and he was working on an ongoing cell tower project.  Tr. (Mar. 20, 2013) at 145:9-146:16.  As plaintiff acknowledged at trial, Hanson could appoint whoever she wanted, and Hanson provided legitimate, non-discriminatory reasons for selecting Grumbach.

Also in January 2009, Hanson provided plaintiff a performance evaluation in which she indicated, as an area for improvement, that plaintiff's "enthusiasm also sometimes comes across as frightening rather than reassuring to the public." Tr. (Mar. 14, 2013) at 36:10-14; _see_ Ex. 90.  According to plaintiff, Hanson's support for this statement was a complaint from a homeowner who was troubled by plaintiff's yelling

at the occupants of a truck that was blocking the roadway during a snowstorm.[13]
Tr. (Mar. 14, 2013) at 39:10-18.  In contrast, Hanson testified that she provided this feedback in relation to "E-lerts," broadcasts by plaintiff's department to the Medina community about safety, emergency preparedness, and crimes in the area, which she viewed as "a bit sensationalist" and perhaps causing more fear than necessary. Tr. (Mar. 20, 2013) at 143:8-144:5.  Regardless of the basis for the partially negative evaluation, plaintiff offered no reason for concluding that it resulted from a discriminatory animus.

With respect to plaintiff's "comparator" evidence, the Court considers it extremely weak.  After his unauthorized use of the MX Logic system was revealed, Fischer received discipline in the form of six months of strictly monitored probation and the removal of several job duties.  Tr. (Mar. 12, 2013) at 204:3-6, 207:23-208:3.  Fischer is a member of a union, and his discipline was subject to the terms of a collective bargaining agreement.

---

[13] In connection with the snowstorm, which occurred in December 2008, plaintiff sought additional compensation for 24 hours of work. Tr. (Mar. 14, 2013) at 23:6-24:8, 24:21-23.  At trial, plaintiff testified that he perceived Hanson's response to his request as disrespectful and lacking in empathy and compassion. Id. at 25:2, 26:13-14.  According to plaintiff, Hanson told him that she would have to get approval from the City Council, id. at 25:7-8, and Hanson eventually informed him, "You got what you asked for," id. at 26:25-27:1.  The compensation was authorized by the City Council. Id. at 27:21. During her testimony, Hanson did not dispute the sequence of events, but explained that she "wasn't familiar with department directors receiving overtime pay because they're exempt employees," meaning they work as many or as few hours as necessary for a fixed salary. Tr. (Mar. 20, 2013) at 142:2-8. Hanson indicated that plaintiff told her he had previously received overtime pay, so she agreed to and did take the request to the City Council. Id. at 142:9-12.  The City Council approved the compensation related to the snowstorm, but the members "were also very clear that they didn't want to see [any] more overtime requests." Id. at 142:14-17.  Plaintiff's suggestion that this episode evidences racial animus is frivolous.  At trial, plaintiff agreed that Hanson raised the issue of overtime with the City Council, as she assured him she would, and that he received the compensation he requested.  Plaintiff's lack of entitlement, as a salaried employee, to such compensation and Hanson's approach of seeking approval from the City Council before authorizing any overtime pay had nothing to do with race or national origin.

ORDER - 26

1   *See* Tr. (Mar. 13, 2013) at 21:12-22:21.  In contrast, plaintiff was an at-will employee.

2   *See* Order at 17-21 (docket no. 251).  No allegation was ever made that Fischer lied to

3   Bolasina or anyone else about whether he had engaged in the improper use of the e-mail

4   archive.  *See* Tr. (Mar. 19, 2013) at 61:5-16 (describing Fischer as "contrite" and stating

5   that Fischer "explained why he did it and he said that he felt that he was wrong when he

6   did it").  Plaintiff, however, was accused of lying to Bolasina by denying that Baker had

7   given him a username and password for the MX Logic system.  *Id.* at 64:16-65:18, 80:24-

8   81:7.  The Court found Bolasina's testimony in this regard quite credible.  Fischer and

9   plaintiff are simply not similarly situated.

10          Jan Burdue was the former finance director for City of Medina.  Tr. (Mar. 20,

11   2013) at 180:10-12.  She was disciplined for submitting a time sheet indicating that she

12   had served an entire day as a juror when she had actually been excused at 9:00 a.m.

13   Tr. (Mar. 21, 2013) at 35:1-23.  Burdue received six months of probation as discipline for

14   this incident.  *Id.* at 36:2-9.  Burdue was subsequently terminated because of errors in

15   handling W2 forms for City of Medina employees.  *Id.* at 37:18-21.  Prior to her

16   discharge, Burdue was provided a *Loudermill* hearing and given an opportunity to tender

17   her resignation.  *Id.* at 37:22-24, 41:9-12.  She did not do so out of concern that she could

18   not then collect unemployment benefits.  Ex. 135 at 18.  Although Burdue apparently

19   misrepresented how the errors in the W2 forms came to her attention, *id.* at 6, no

20   evidence was presented that Burdue's mishandling of the W2 forms involved any fraud

21   or dishonesty.  Thus, Burdue was terminated on less severe allegations than those lodged

22

23

ORDER - 27

1   against plaintiff, and if anything, her discharge negates plaintiff's claim of discriminatory

2   treatment.

3             **d.      Withholding Information from Investigators**

4         Plaintiff's final attempt to show discriminatory animus involves information that

5   plaintiff contends Hanson improperly withheld from investigators Way, Bolasina, and

6   Lenhart.[14]  With regard to Way, plaintiff complains Hanson did not tell Way that plaintiff

7   had been given the "rachel_prr" username for the MX Logic system.  *See* Tr. (Mar. 21,

8   2013) at 197:1-13.  Plaintiff's criticism is frivolous.  Even if Way had been advised that

9   plaintiff possessed the "rachel_prr" username and related password, Way would have

10  discovered the same external IP addresses and made the same recommendation; absent a

11  subpoena or search warrant, Way could not have determined whether the IP addresses via

12  which the MX Logic system had been accessed with the "rachel_prr" username belonged

13  to plaintiff or someone else.  Tr. (Mar. 21, 2013) at 187:16-22.  Plaintiff's contentions

14  that Way would have reached a different result if he had known plaintiff had been given

15  the "rachel_prr" username, and that Hanson should have conveyed such information to

16  Way, running an even greater risk of being accused of engaging in a "witch-hunt," lack

17  any merit.

18  _____

19  [14] This argument is made in plaintiff's response to defendants' motion for JMOL, *see* Resp. at 6 (docket no. 393), which plaintiff incorporated by reference into his response to defendants' motion for a new trial,

20  *see* Resp. at 12 (docket no. 390).  Plaintiff's response to the motion for JMOL contains ten pages of endnotes, which defendants moved to strike as violating the page limitations outlined in the Local Civil

21  Rules.  *See* Reply at 1 n.2 (docket no. 396).  Plaintiff's counsel's use of endnotes, which appear outside the twelve-page limit, was improper, *see* Local Civil Rule 7(e)(6), but the Court declines to strike the

22  contention regarding information allegedly withheld from investigators or the associated endnotes, W, X, and Y.

23

1      With respect to Bolasina, plaintiff laments that Hanson did not inform Bolasina

2   she had instructed Yourkoski to tell King County Sheriff's Deputy William Marik to

3   "proceed with a criminal trespass charge in this matter."  Tr. (Mar. 19, 2013), at 95:4-7.[15]

4   Plaintiff, however, presented no evidence that Hanson ever directed Yourkoski

5   specifically to pursue a "criminal trespass charge."  Hanson cannot be at fault for not

6   telling Bolasina about something, namely a directive to "proceed with a criminal trespass

7   charge," that no evidence in the record establishes occurred.  Moreover, even if Hanson

8   failed to mention that the charge she wanted to pursue was criminal trespass, such

9   omission is not material and would not demonstrate any animus based on race or national

10   origin.  Finally, plaintiff's suggestion that Bolasina was somehow not fully apprised by

11   Hanson about the attempted pursuit of subpoenas or search warrants through the initiation

12   of a criminal investigation is ludicrous; Bolasina was the primary contact person for City

13   of Medina after Marik was assigned to work on the matter.

14      As to Lenhart, in asserting that Hanson concealed information from her, plaintiff

15   cites to a portion of Lenhart's trial testimony, but omits the crucial two questions and

16

17   _____

18   [15] Having been advised by Marik that, to obtain a subpoena or search warrant, a criminal investigation
    needed to be initiated, Tr. (Mar. 12, 2013) at 166:22-25, Yourkoski told Marik, after consulting with
19   Hanson, that City of Medina wanted to commence a criminal investigation.  Id. at 149:9-15, 166:9-16.
    Marik advised Yourkoski to contact one of four agencies, including the United States Secret Service.  Id.
20   at 165:9-166:16.  Yourkoski did so, and about a week later, Marik received a telephone call from a Secret
    Service Assistant Special Agent in Charge, asking him to follow up on this matter in his capacity as a
    member of the Electronic Crimes Task Force, and providing to him Bolasina's contact information.  Id. at
21   162:22-163:15, 168:12-169:18.  Marik contacted Bolasina the next day and received from Bolasina a
    copy of Way's report.  Id. at 169:17-170:9.  After further communications with Bolasina and discussions
    with two Assistant United States Attorneys, Marik informed Bolasina that no criminal case would be
22   opened.  Id. at 170:22-174:6; see Ex. 307.

23

ORDER - 29

1   answers.[16]  Having reviewed the complete dialogue, the Court understands plaintiff to be

2   casting aspersions against Hanson for not telling Lenhart something that plaintiff said in a

3   document, which was reviewed by Lenhart prior to interviewing plaintiff, and about

4   which Lenhart and plaintiff specifically spoke before Lenhart issued her report.  In other

5   words, before reaching any findings or conclusions, Lenhart was fully aware of plaintiff's

6   gripe that Hanson did not advise him he was under investigation.  This evidence does not

7   establish any omission by Hanson, let alone any discriminatory animus.

8               **e.    Conclusion**

9          The Court agrees with plaintiff's counsel's premise that discrimination in our

10  current era takes a different form than the racism of yesteryear.  It is not as obvious and

11  does not necessarily involve the use of racial slurs or other offensive language.  It is also

12  more difficult to prove.  Nevertheless, proof is still required.  In this case, in the Court's

13  view, plaintiff relied primarily on innuendo and subterfuge rather than on evidence.  The

14  Court, however, acknowledges that a jury could assess the credibility of the witnesses

15

16  [16] Plaintiff relies on the exchange between Jones and Lenhart beginning on page 110, at line 21, and
    ending on page 111, at line 13, of the transcript from March 22, 2013.  *See* Resp. to Mtn. for JMOL at

17  16 n.Y (docket no. 393).  The cited colloquy is confusing and proves nothing.  The subsequent discussion,
    however, provided clarity:

18          Q:  Did you subsequently learn, during your investigation, that Donna Hanson had
            never told Chief Chen that he was under investigation?

19          A:  If I recall correctly, that was a statement made in one of the documents prepared
            by Mr. Chen.

20          Q:  That document, that comes after his termination; is that correct?

            A:  No, I'm not sure.  I recall reading that there was an assertion on Mr. Chen's part
21          that Ms. Hanson had never told him he was under investigation, that he had never been
            notified of that, because that is something I discussed with him during my interview with
            him.

22  Tr. (Mar. 22, 2013) at 111:14-25.

23

ORDER - 30

1   and weigh the evidence differently than the Court, and the Court has therefore previously

2   denied defendants' motion for judgment as a matter of law.  In granting a new trial, the

3   Court does not prejudge whether another jury will reach a similar or different verdict;

4   however, the Court will more rigorously patrol plaintiff's counsel's conduct to prevent

5   her from infusing into a second trial the various contaminates that make upholding the

6   first verdict impossible.

7           **3.    <u>Affirmative Defense</u>**

8           Even if plaintiff's evidence was sufficient to establish that race and/or national

9   origin was a substantial factor in the various adverse employment actions, the great

10  weight of the evidence supports the conclusion that defendants would have terminated

11  plaintiff on the basis of the wrongdoing alleged in the notice of discharge even if race

12  and/or national origin had played no role in the decision.  In terminating plaintiff, Hanson

13  identified six non-discriminatory reasons for her decision:  (i) making false statements to

14  both Bolasina and Lenhart; (ii) forging memoranda under the names of subordinates;

15  (iii) removing or destroying data on City-owned electronic equipment; (iv) improperly

16  using City funds for particular purchases; (v) improperly accessing the MX Logic system;

17  and (vi) losing the confidence of many of the employees of the Medina Police

18  Department.  Ex. 385 (copy filed as Ex. GGG to Holt Del. (docket no. 158-7)).

19          With regard to the first basis enumerated in the notice of discharge, during trial,

20  plaintiff attempted to cast his statements to Bolasina as the product of a misunderstanding

21  about the nature and subject of their meeting.  *See* Tr. (Mar. 14, 2013) at 81:3-86:12.

22  According to Bolasina, however, during the interview on December 15, 2010, Bolasina

23

explicitly asked plaintiff whether Baker had given plaintiff a username and password for

the e-mail archive, and plaintiff falsely denied receiving such information from Baker.

Tr. (Mar. 19, 2013) at 65:12-18, 83:17-84:21, 88:15-89:18.  Based on his belief that

plaintiff lied to him, making him a witness in this matter, Bolasina was forced to

withdraw as counsel for City of Medina.  This fact belies any motive on Bolasina's part

to fabricate, exaggerate, or embellish events.  Moreover, the draft written statement that

Bolasina contemporaneously e-mailed to plaintiff for review and signature corroborates

Bolasina's recollection of events; if plaintiff had not made the representations

memorialized in the draft, Bolasina would have had no purpose for sending it to plaintiff.

The great weight of the evidence supports a finding that plaintiff made false statements to

Bolasina.

Likewise, the Court is persuaded that the great weight of the evidence establishes

plaintiff lied to Lenhart.  Through his expert Marcella Fleming Reed, plaintiff attacked

Lenhart's methodology, accusing her of not being independent and of not interviewing

crucial witnesses.[17]  Tr. (Mar. 18, 2013) at 116:10-118:6.  The first criticism was not

based on any evidence, both Hanson and Lenhart having testified that Hanson did not in

any way direct Lenhart's investigation, Tr. (Mar. 20, 2013) at 162:15-16, 178:6;

Tr. (Mar. 22, 2013) at 49:20-22, 50:11-14, 55:12-16, and the second criticism lacked

---

[17] Over defendants' objection and despite the Court's admonishment about its prior rulings, plaintiff's counsel elicited from plaintiff testimony insinuating that Lenhart was biased by her familiarity with Eric Hokanson, an employee at a shop where Lenhart took her car for servicing.  Tr. (Mar. 14. 2013) at 139:8-140:13.  For the reasons that Hanson rejected this allegation of bias when it was lodged prior to plaintiff's *Loudermill* hearing, *see* Order at 7 n.2 (docket no. 251), plaintiff's challenge to Lenhart's impartiality is baseless and was inappropriately presented to the jury.

substance because Fleming Reed did not herself interview two of the three witnesses at

issue and did not know what they might have contributed to the investigation,

Tr. (Mar. 18, 2013) at 118:2-6, 124:22-125:11, and the third witness, Officer Emmet

Knott, did not add much to the mix of information.[18]  The Court carefully observed

Lenhart when she testified and found her to be extraordinarily professional and credible.

The Court reviewed Lenhart's report and found it to be well-crafted and thorough.  Most

of the individuals Lenhart interviewed during her investigation testified at trial, and the

Court found no reason to doubt the veracity of any of these witnesses.  Thus, the Court

takes particular note of Lenhart's observation during cross-examination that this case was

unusual because she had never before interviewed a witness who she "felt was lying as

much as Mr. Chen."  Tr. (Mar. 22, 2013) at 139:7-9.

---

[18] As to certain statements and actions attributed to Yourkoski, Knott's trial testimony was merely cumulative.  His testimony that he would have told Lenhart that Yourkoski was "capable of lying in a report, in a statement under penalty of perjury," Tr. (Mar. 18, 2013) at 89:7-8, and the specific instance of alleged misconduct that Knott recounted, *see id.* at 89:10-91:25, was improper impeachment of Yourkoski that would have been excluded had an objection been made.  *See* Fed. R. Evid. 404(b) & 608(b).  The Court does not view these aspersions Knott might have cast against Yourkoski if interviewed by Lenhart as diminishing the thoroughness or reliability of Lenhart's investigation; Lenhart is an attorney who is presumably familiar with the principles underlying the evidentiary rules governing the manner in which credibility may be impugned.  With regard to the four MP-5 select-fire submachine guns costing $2,000 each, which were purchased by plaintiff with City of Medina funds, Knott agreed that the Medina Police Department has never deployed them during a call or an incident.  Tr. (Mar. 18, 2013) at 101:4-5, 101:17-20, 102:4-8.  Finally, Knott's testimony about training request memoranda signed by Yourkoski, *see id.* at 80:20-82:19, 107:20-108:23, did nothing to establish a custom at the Medina Police Department of officers authoring memoranda on behalf of others.  Rather, the memoranda speak for themselves, and they reflect that Yourkoski signed or drafted each memorandum on his own behalf as either making or authorizing the training request for or of another officer.  *See* Ex. 1071.

Without disputing that he engaged in the other conduct on which Hanson based his discharge, namely creating memoranda on behalf of subordinates without their consent,[19] deleting electronic data in which the public might have an interest, spending City funds in a questionable manner,[20] and using Baker's identity and password to access the MX Logic system, plaintiff offered what he believed to be innocent explanations for these various actions.[21] Defendants, however, presented multiple witnesses who testified

---

[19] In contrast to Yourkoski's legitimate training memoranda, plaintiff's improper memoranda, which he acknowledged crafting, see Tr. (Mar. 15, 2013) at 83:9-19, were written as though they had been generated by another officer and then circulated to him. For example, Sergeant John Kane testified that, after being asked by Bolasina about the purchase of three iPod Touches with City of Medina funds, he discovered related memoranda, ostensibly from Kane to plaintiff, that Kane did not write and did not authorize anyone to write on his behalf. Tr. (Mar. 22, 2013) at 13:21-14:22, 18:7-19:4. Similarly, Officer Michael Girias learned that a memorandum concerning the voiding of a ticket, which was addressed to plaintiff, had been generated as though it came from him. Tr. (Mar. 21, 2013) at 149:24-150:15. At trial, Girias explained that sending a memorandum of this nature directly to plaintiff was not consistent with protocol, but rather such matter would ordinarily be worked up through the chain of command, and the memorandum incorrectly indicated that, at the time the memorandum was created, the ticket had not left Girias's possession, when in fact Girias had already turned in the ticket for processing. Id. at 154:8-18, 169:15-170:3. With regard to both memoranda, Lenhart testified that, when she interviewed plaintiff, he told her Kane and Girias were the respective authors; Lenhart indicated at trial she was unaware that plaintiff later admitted he in fact created the memoranda. Tr. (Mar. 22, 2013) at 74:3-13, 75:19-76:4. Plaintiff's confession was made in response to Lenhart's report, along with the explanation that "[t]his is a common business practice in police departments where the supervisor will craft a memo in the name of the subordinate." Ex. 376 at 30 (copy filed as Ex. DDD to Holt Decl. (docket no. 158-7)). Plaintiff's assertion of "common practice" is belied by his previous false statement to Lenhart, denying that he fabricated the memoranda at issue. If plaintiff's conduct was indeed consistent with Medina Police Department standards, plaintiff presumably would not have felt the need to hide it from Lenhart.

[20] The expenditures of concern included two "North Face" jackets, described by plaintiff to Director of Finance Nancy Adams as being under evaluation for use by patrol officers, but both jackets were size medium, which was inconsistent with the explanation because most of the officers would need a large or extra large. Tr. (Mar. 20, 2013) at 125:17-126:11. At trial, plaintiff indicated that he himself wore either the lighter or heavier "North Face" jacket, depending on the weather, to and from work. Tr. (Mar. 15, 2013) at 85:7-17. Although Lenhart's report identified other suspicious purchases, including knives, automatic machine guns, and supplemental oxygen containers, see Ex. 1074, Hanson did not rely on those allegations in discharging plaintiff, see Ex. 385, and the time used during trial by plaintiff's counsel exploring whether these items were returned to or later located at the Medina Police Department was misspent.

[21] At trial, plaintiff explained that he accessed the MX Logic system for the purposes of reviewing e-mails to determine whether or not they should be disclosed in response to public records requests, investigating

1   that this behavior was a breach of protocol and inconsistent with the expectations of a

2   chief of police.  One witness, Sergeant Kane, summed up matters by indicating that, if

3   plaintiff were reinstated, he would immediately submit his resignation, Tr. (Mar. 22,

4   2013) at 19:7-9, and two other witnesses, Officer Girias and Officer James Martin,

5   indicated that they would not work for plaintiff again, Tr. (Mar. 21, 2013) at 160:7-16; *id.*

6   at 138:2-7.

7           To reach the conclusion that defendants failed to prove by a preponderance of the

8   evidence that they would have made the same decision to terminate plaintiff even if race

9   and/or national origin had played no role, the jury had to disregard the testimony of two

10  independent investigators, the City Manager, the City Clerk, the Director of Finance, and

11  at least four members of the Medina Police Department.  The jury might have been

12  persuaded by plaintiff's counsel inappropriate statement at the beginning of her rebuttal

13  indicating that "[a] case doesn't get to federal court unless a case exists," Tr. (Mar. 25,

14  2013) at 62:22-23, or by some other appeal to passion or prejudice, but regardless of what

---

16  alleged leaks of information, and obtaining his own messages when the e-mail system was down.
    Tr. (Mar. 14, 2013) at 66:17-67:9.  At the summary judgment stage, plaintiff provided entirely different
17  reasons for using the MX Logic system, namely to gather "records relevant to ongoing 2011 budget
    preparations" and to "conduct a regular review of officer communications."  Chen Decl. at ¶ 66 (docket
18  no. 191).  Plaintiff's change of rationale, apparently in response to the Court's dismissal of his
    "whistleblower" claims, *see* Order (docket no. 251), is troubling, but regardless of what grounds plaintiff
19  claims to have had for reading the e-mails of other individuals, plaintiff's use of an identity and password
    belonging to another employee is strong evidence that his access was improper.  Moreover, unlike Fischer
20  and Kane, who candidly acknowledged accessing the MX Logic system, the former for an inappropriate
    purpose and the latter at plaintiff's direction, *see supra* note 4; Tr. (Mar. 22, 2013) at 35:7-36:10, plaintiff
21  denied even possessing the very username and password that he had given to Kane.  Had plaintiff actually
    believed his use of the MX Logic system was authorized, he presumably would not have felt compelled to
22  conceal information about such access from Bolasina.  Indeed, at trial, plaintiff acknowledged that he had
    been cautioned by Kane that he "could get fired for snooping into e-mail archives."  Tr. (Mar. 15, 2013)
    at 94:12-18.

23

ORDER - 35

1   improperly swayed the jury, its verdict bears no correlation to the great weight of the

2   evidence, and the Court concludes that defendants are entitled to a new trial at least with

3   regard to their strong "same decision" defense.

### 4.   Conclusion

5   Having considered all of the evidence and the credibility of the witnesses, the

6   Court is left with "the definite and firm conviction that a mistake has been committed"

7   with respect to the jury's verdict on liability as to plaintiff's discrimination claims.  This

8   ruling also calls into doubt the verdict on liability as to the substantive due process claim,

9   as to which the jury was instructed that, if it found Hanson's action was based solely on

10  race or national origin, it must conclude that Hanson's action was arbitrary and lacking a

11  rational basis.  Instr. No. 15 (docket no. 321).  Likewise, the jury's verdict concerning

12  punitive damages cannot stand.  Defendants are entitled to a new trial on all of plaintiff's

13  claims.

## B.   Excessive Verdict

15  The Court must apply state law in determining whether damages awarded on a

16  state law claim are excessive.  _Cosby v. AutoZone, Inc._, 445 Fed. Appx. 914, 916 (9th

17  Cir. 2011).  In Washington, courts are authorized by statute to order a new trial if "the

18  damages awarded by a jury . . . [are] so excessive or inadequate as unmistakably to

19  indicate that the amount thereof must have been the result of passion or prejudice."

20  RCW 4.76.030.   In addition to "passion or prejudice," Washington courts recognize as

21  grounds for a new trial that the damages either "are outside the range of substantial

22  evidence in the record" or "shock the conscience of the court."  _Green v. McAllister_, 103

23

ORDER - 36

1    Wn. App. 452, 462, 14 P.3d 795 (2000).  Under Washington law, a court may, as an

2    alternative to a new trial, reduce a jury's damages award, but only with the plaintiff's

3    consent.  RCW 4.76.030; _see_ _Green_, 103 Wn. App. at 462.  In addition, Washington

4    courts are permitted to order a new trial on damages only, leaving the jury's liability

5    determination intact.  _Id._ (citing Wash. Civ. R. 59(a)).

6         Plaintiff's expert, Robert W. Moss, testified via perpetuation deposition that, if

7    plaintiff did not work from the time of trial until the end of his worklife expectancy,

8    estimated to be another 13.2 years, the present value of front pay, including wages and

9    benefits, would total $1,650,000.  Moss also testified that the scenario of plaintiff not

10   working again until the end of his worklife expectancy was "highly unlikely" and had "a

11   very low probability."  Moss also performed calculations on the assumption that plaintiff

12   would find employment in law enforcement or a related field within the next six months,

13   starting at seventy percent (70%) of his prior salary and increasing faster than average

14   over the next five years to the level he would have been earning had he remained at City

15   of Medina.  Using this model, Moss arrived at a front pay figure of $270,900.  Moss

16   described this outcome as one of the two "most probable" for plaintiff.  The other "most

17   probable" outcome about which Moss testified involved plaintiff obtaining employment

18   outside the law enforcement field, earning the same amount as a person who holds a

19   bachelor's degree, which was estimated at $65,000 per year plus benefits.  For this

20   hypothetical, Moss derived a front pay amount of $700,675.  He described this scenario

21   as "the single highest likelihood," reflecting "a serious long-lasting impact on [plaintiff's]

22   employment potential and ability to work in his chosen field."

23

1   The jury's award of $1.65 million in front pay on the WLAD claim is unsupported

2   by the evidence.  The assumption underlying the jury's calculation, namely that plaintiff

3   will never work again, bears no relationship to reality.  Plaintiff is educated and able-

4   bodied and his own expert testified that he could likely find employment outside the law

5   enforcement field, earning the same amount as a typical college graduate.  The jury might

6   have been swayed by plaintiff's counsel's argument that "[f]ront pay is $1,650,000.  And

7   again, it was never contested," Tr. (Mar. 25, 2013) at 36:19-20, but a lawyer's statement

8   is not evidence, _see_ Instr. No. 5 (docket no. 321), and the jury had a duty to award only

9   those damages proven by plaintiff by a preponderance of the evidence, _see_ Instr. No. 16.

10  The jury's excessive award is also an indication that the jury was influenced by Jones's

11  improper comments during opening statement and other breaches of the Court's rulings

12  in limine and/or by passion or prejudice in reaching its decision on liability, and the Court

13  is satisfied that a remittitur of the front pay award or a new trial solely on damages for the

14  state law discrimination claim does not provide a sufficient remedy.  Defendants are

15  entitled to a new trial on liability and damages as to both federal and state law claims.

16  **C.**   **Attorney Misconduct**

17       To warrant a new trial, attorney misconduct must "sufficiently permeate an entire

18  proceeding to provide conviction that the jury was influenced by passion and prejudice in

19  reaching its verdict."  _Kehr v. Smith Barney, Harris Upham & Co._, 736 F.2d 1283, 1286

20  (9th Cir. 1984).  In deciding whether to grant a new trial, the Court may consider the

21  nature of the improper comments, their frequency, and their relevance to the issues before

22  the jury, _Hemmings v. Tidyman's Inc._, 285 F.3d 1174, 1193 (9th Cir. 2002), as well as

23

ORDER - 38

1   whether the offending behavior occurred principally during opening and/or closing

2   statements, which the jury in this case was instructed does not constitute evidence,

3   Instr. No. 5 (docket no. 321), as opposed to throughout the course of the trial, _Kehr_, 736

4   F.2d at 1286.  The Court may also analyze whether opposing counsel timely objected,

5   requested a curative instruction, or moved for a mistrial, while bearing in mind the

6   potentially antagonizing effect on the jury of frequent objections.  _Id._; _see Anheuser-_

7   _Busch_, 69 F.3d at 346; _see also Hemmings_, 285 F.3d at 1193 (applying the plain error

8   standard to a claim of improper closing argument that was raised for the first time after

9   trial).  Moreover, the Court may take into account the strength of the offending party's

10   case, _see Hemmings_, 285 F.3d at 1195, and whether the jury's award of damages was

11   excessive, _see Kehr_, 736 F.2d at 1286.

12       The irregularities in the trial of this matter began right after Jones began delivering

13   her opening argument on plaintiff's behalf.  Prior to trial, defendants successfully moved

14   to exclude discriminatory statements that could not properly be imputed to either Hanson

15   or City of Medina, including Knapp's "Charlie Chan," "smiling Chinaman," and "cotton-

16   picking" remarks, Skinner's "Asians don't make good managers" comment, Biglow's

17   "Harry Potter" parody, Paulman's stated refusal to "talk to Orientals," and Jordan's

18   observation about Asians having "small ones."  _See_ Def.'s Mtns. in Limine (docket

19   no. 204); _see also_ Minute Orders (docket nos. 239 & 265).  Despite the Court's explicit

20

21

22

23

1    orders in limine,[22] during the first few minutes of opening argument, Jones managed to

2    violate the bulk of them, repeating the "Charlie Chan" statement three different times,

3    Tr. (Mar. 11, 2013) at 6:5, 9:25, 11:1, the "smiling Chinaman" comment twice, _id._ at

4    10:1-2, 11:2-3, and the "cotton-picking" remark with commentary, _id._ at 10:4-7, telling

5    the jury about Skinner's, Paulman's, and Jordan's[23] excluded statements, _id._ at 10:18-20,

6    11:5-6, 12:9-10, and attacking Yourkoski for repeating Knapp's comments, _id._ at 10:21-

7    11:3.[24]  Jones also attributed to Biglow the statement that "Asians can't be trusted," _id._ at

8    7:11, and attempted to introduce other remarks by Biglow before the Court interceded, _id._

9

10   _____

11   [22] Jones's contention that the Court's rulings were somehow unclear is not well taken.  The Court's
     Minute Orders, docket nos. 239 and 265, exactly tracked the sequence of defendants' motions in limine,

12   using the same letters and brief summaries to identify each motion.  For example, defendants' motion in
     limine "A," which sought to exclude testimony or evidence "regarding alleged discrimination, hostile
     work environment, or a 'culture of racial bias and discrimination' directed at persons other than plaintiff,"

13   was unequivocally granted.  Minute Order at ¶ (2)A (docket no. 239).  The motion itself described in
     detail the specific statements to be excluded.  _See_ Def.'s Mtns. in Limine at 5 (docket no. 204).  No

14   reasonable attorney could fail to understand that the comments enumerated in defendants' motion in
     limine "A" were not to be repeated to the jury.  Moreover, to the extent that Jones was confused or
     uncertain, she had ample time and opportunity to seek clarification about the Court's orders in limine

15   outside the presence of the jury, but she never did so.

16   [23] Also in violation of the Court's in limine rulings, and in response to prompting by Jones, plaintiff
     testified that Jordan described his own father as "the biggest racist that ever walked this planet."
     Tr. (Mar. 14, 2013) at 175:22-177:1.  The jury was told to disregard this evidence, which had no

17   relevance to the issues in this case, and the jury is assumed to have complied with this instruction, but the
     Court has considered this exchange as an example of the misconduct that permeated this trial.

18   [24] During closing argument, Jones improperly imputed Yourkoski's comments to Hanson, stating:

19             For years Lieutenant Yourkoski repeated to Chief Chen the racial slurs that he heard first
               from Chief Knapp. . . .  Lieutenant Yourkoski testified that to date he has not been
               disciplined for this.  And we all know who it is that permits this behavior to continue in

20             the city.  The one at the helm, the City Manager.

     Tr. (Mar. 25, 2013) at 19:21-20:5.  Plaintiff, however, presented no evidence that he ever complained to

21   Hanson about Yourkoski's alleged taunting or that Hanson had any knowledge about it.  Moreover,
     plaintiff, and not Hanson, was Yourkoski's immediate supervisor, and plaintiff had both the authority and

22   the responsibility for disciplining Yourkoski if such improper behavior was in fact taking place.  Jones's
     suggestion otherwise in her closing remarks was inappropriate.

23

     ORDER - 40

at 10:8-16.[25]  Defendants timely objected to the majority of Jones's violations of the

Court's rulings, putting defendants at the outset of trial in the unenviable position of

appearing to the jury as if they were hiding information, but they had no success in

corralling Jones's opening argument.

During the course of trial, Jones further defied the Court's orders in limine by

eliciting testimony from experts about opinions that were based on evidence the Court

had ruled was inadmissible.  In particular, Wilson Edward Reed stated his belief that

certain "slurs took an impact on [plaintiff] as a professional," and when asked what slurs

or facts he was referencing, Reed erroneously attributed to Hanson the statement, "You

cannot trust a smiling Chinaman."  Tr. (Mar. 20, 2013) at 40:18-42:7.  Defendants

objected, indicating that the remark had been made by former Chief Knapp in 2003, and

the jury was instructed to disregard the testimony.  _Id._ at 42:11-14.  Reed, however, later

volunteered in response to Jones's request to provide an example of an "old school"

statement by Hanson:

> The racial slurs that I observed around Thanksgiving and, "Do you
> celebrate Thanksgiving," and "Do you eat turkey?"  This stuff is old-

---

[25] Jones also tried to elicit testimony about Biglow's "Harry Potter" style e-mail by asking, "In 2008, what council member made a racially disparaging comment?"  Tr. (Mar. 18, 2013) at 37:9-10.  In response, the witness, Shawn Whitney, identified City Council member Lucius Biglow, and defendants objected to further inquiry.  _Id._ at 37:11-14.  During the ensuing colloquy, Jones managed to misinform the jury that Biglow's remark was "specifically about Chief Chen," _id._ at 38:1-3, and to misrepresent to the jury that "[w]e already have a ruling that it's allowed," _id._ at 38:18-19.  Both the phrasing of Jones's question to Whitney and Jones's subsequent editorial put defendants in an untenable position.  The evidence was excluded because Biglow was censured for his behavior, because the incident, as well as the discipline, occurred before Hanson became city manager, and because Biglow's parody did not involve and was not aimed at plaintiff.  By ignoring the Court's clear and explicit ruling deeming this evidence inadmissible, Jones was able to impute to defendants an offensive statement that is not attributable to them as a matter of law before defendants could even launch an objection.

school.  It's old-school racism, 25 or 30 years old.  And my opinion is
it's latent, it's been dormant for years, and this is coming from stake-
holders, the gatekeepers in the community that want to keep the status
quo."

_Id._ at 50:17-23.  Defendants objected as soon as they could, but the bell had already rung.

_Id._ at 50:24-25.  In this manner, despite the Court's previous rulings, Reed effectively

connected Hanson to, and inappropriately made her responsible for, the offensive conduct

of predecessors and community members.

      In addition, Norman Stamper, a former chief of police, was asked by Jones to

describe the facts on which he relied "with respect to race issues" between plaintiff and

City of Medina.  Tr. (Mar. 21, 2013) at 87:24-25.  Defendants objected to this line of

inquiry both before and after this exact question was posed, on the grounds that plaintiff

had already called an expert on discrimination in the workplace and that the question as

framed was overbroad.  _Id._ at 86:13-14, 88:1.  Based on Jones's representation that the

subject of Stamper's testimony somehow differed from the topics covered by plaintiff's

other expert, Jones was permitted to press forward.  _See id._ at 86:24-87:23.  Stamper then

indicated that he "counted eight or nine instances of what [he] would consider to be

unambiguously racially charged anti-Asian sentiment being expressed within the city,

from both the community and government."  _Id._ at 88:3-6.  The Court concluded that,

contrary to Jones's assertion, Stamper's testimony was indeed cumulative.  _Id._ at 88:9-13.

Jones persisted by asking to provide an offer of proof.  _Id._ at 88:14-15.  This colloquy is

particularly troubling because, not only did Jones lack a good faith basis for asserting that

Stamper's testimony was not duplicative, she had no colorable argument that the eight or nine instances to which Stamper referred constituted admissible evidence.

At oral argument on the pending motion for a new trial, defendants' counsel postulated that, given the weakness of plaintiff's case, the jury rendered a verdict in plaintiff's favor only because it was improperly influenced by Jones's misconduct.  The Court declines to reach so sweeping a conclusion, but agrees with the basic premise that Jones's behavior must be viewed through a lens that also considers the weakness of plaintiff's case on liability and the excessiveness of the jury's award of front pay on plaintiff's state law discrimination claim.  In light of the evidence that was properly before the jury, the Court concludes that plaintiff's counsel's misconduct had an inappropriate effect on the jury's decision.  The discriminatory remarks Jones paraded before the jury during her opening statement and about which she elicited testimony from plaintiff and his experts during trial were excluded precisely because defendants in this matter, City of Medina and Donna Hanson, cannot be held liable on the basis of such comments.  By continually intimating to the jury that racial animus on the part of defendants was demonstrated by the offensive conduct of individuals who were either disciplined for the behavior or disconnected from defendants by the passage of time or a lack of privity, Jones converted an extraordinarily weak case of discrimination into a $2 million verdict, the bulk of which is unsupported by the evidence.  Defendants are therefore entitled to a new trial.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) Defendants' motion for a new trial, docket no. 361, is GRANTED;

(2) The Verdict, docket no. 325, Findings of Fact and Conclusions of Law, docket no. 344, and Judgment, docket no. 345, are VACATED;

(3) Plaintiff's motion for costs, docket no. 350, and motion for attorney fees, docket no. 365, are STRICKEN without prejudice;

(4) The parties are DIRECTED to file a Joint Status Report within twenty-eight (28) days of the date of this Order concerning when they anticipate being ready for retrial of this matter; and

(5) The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

Dated this 23rd day of August, 2013.

Thomas S Zilly

THOMAS S. ZILLY
United States District Judge

ORDER - 44